## J. S. EMERY *v.* THE SAN FRANCISCO GAS COMPANY.

Property subject to right of Eminent Domain.—The property referred to in that clause of the Constitution which declares that private property shall not be taken for public use without just compensation, is other kinds of property than money, and the compensation referred to is a compensation to be made in money.

44

ASSESSMENT ON LOTS TO GRADE STREET, A TAX.—An assessment upon the different lots fronting on a street in a city in proportion to the number of feet frontage of each, for the purpose of raising money to pay the expenses of grading the street, is an exercise of the sovereign right of taxation, and not of the power to appropriate private property to public use under the right of eminent domain.

MEANING OF TAXATION.—The words "taxation" and "taxed," in section thirteen of Article XI of the Constitution, relate to such general taxes upon all property as are levied to defray the ordinary expenses of the State, county, town, and municipal governments, and not to assessments levied on the lots fronting on a street in a city to pay the expenses of their improvements.

ASSESSMENTS ON LOTS FOR IMPROVING STREETS.—The Constitution does not prohibit the Legislature, or municipal authorities acting under authority of law, from imposing assessments upon lots in a city fronting on a street to defray the expenses of improvements of the street in the nature of grading and planking.

APPORTIONMENT OF SUCH ASSESSMENTS.—It rests in the discretion of the Legislature to say upon what principle the assessment on lots fronting on a street, to pay for improvements on the street, shall be apportioned among the lots.

IMPROVING STREETS IN SAN FRANCISCO.—A resolution of the Board of Supervisors of San Francisco, declaring an intention to improve a street, may include a declaration of intention to both grade and macadamize. Such resolution sufficiently describes the work to be done if it declares that the street will be graded and macadamized from one designated point to another.

CONTRACT TO GRADE A STREET IN SAN FRANCISCO.—A contract to macadamize a street in San Francisco, made with the Superintendent of Streets, binds the party to use such materials as are required by the Superintendent if it provides that the work shall be performed according to specifications annexed, and such specifications made by the Superintendent name the material to be used.

VARIANCE BETWEEN RESOLUTION AND CONTRACT.—A resolution declaring an intention to improve a street in San Francisco is not vitiated because it states an intention to grade and macadamize from Mission to Howard street, while the contract executed under the resolution calls for grading and macadamizing that portion of the street "except where done."

APPEAL from the District Court, Fourth Judicial District, City and County of San Francisco.

The respondent, Emery, entered into a contract with the Superintendent of Streets in San Francisco on the 25th day of September, 1862, to grade and macadamize Fremont street from Howard to Mission. The contract was completed January 17th, 1863. The appellant was the owner of a lot fronting on Fremont street, between Mission and Howard. This action was brought to recover the amount assessed on appellant's lot for the work. Plaintiff recovered judgment in the Court below, and defendant appealed.

The other facts are stated in the opinion of the Court.

*Wm. M. Pierson*, for appellant, argued that the Board of Supervisors had no power under the statute of 1862 to declare their intention to grade *and also to macadamize* a street in the same notice or resolution; and that the resolution did not describe the work to be done, as required by statute. He contended that the resolution of intention was the primary step in the whole proceeding; the one on which all the subsequent proceedings rested. It was jurisdictional in its nature, declared so by the fourth section of the statute, and if all the requirements of the law were not strictly complied with, it was a vain act, endowing the subsequent proceedings with no vitality, and creating no obligation on the part of the property owner.

He referred to the third section of the Act, and argued that the Board might order either the grading or the macadamizing of a street, but could not order the two conjunctively, and referred to Blackwell on Tax Titles, 64. He also insisted that the contract was void, because it varied from the resolution declaratory of intention to do the work and order to do it, as the resolution and order gave notice and required Fremont street to be graded and macadamized from Mission to Howard, while the contract was for grading and macadamizing except where done.

*H. H. Haight*, also for appellant, argued that the facts stated in the complaint were not sufficient to constitute a cause of action, for the reason that the Act of 1862, under which the proceedings were taken, was unconstitutional and void, and referred to *Creighton* v. *Manson*, 27 Cal. 613. He contended that as the Act could not be sustained as an exercise of the taxing power, and as it contained no provision for compensation under the exercise of the right of eminent domain, it must fall.

*D. P. & A. Barstow*, for respondent, confined their argument to the technical objections to the proceedings made by Mr. Pierson.

By the Court, SAWYER, J.

This is an action brought in pursuance of the Act of 1862, relating to the City of San Francisco, to recover a sum of money assessed upon property fronting on a certain street in that city, in proportion to its frontage, to pay the expenses of grading said street. It presents some of the much vexed questions arising under statutes relating to this class of burdens imposed upon property holders in towns and cities. As usual in such cases, it is claimed, firstly, that the law under which the assessment is made is unconstitutional; secondly, if constitutional, that there are such irregularities in the proceedings as to vitiate the assessment. The recent case of *Creighton* v. *Manson*, decided by this Court (27 Cal. 614) is relied on by appellant as settling the principles that must govern this case. In that case, although all the Justices concurred in the judgment, there was not an entire concurrence in all the views expressed in the opinion, or in the grounds upon which the decision rested. Constitutional questions were discussed in the case, but the only points decided were—firstly, that the defendant was not personally liable, for the reason that no personal liability was imposed by the Act of 1859; and secondly, that there was no lien on the defendant's lot, for the reason that the work had never been ordered by the Board of Supervisors in the mode prescribed by law. It is but just to the Court to say, that neither in that case, nor in this, nor in either of the other cases now before us involving the same questions, have we received any aid from counsel, whose interest it was to support the constitutionality of the law, and not only was there no argument upon this important point on that side, but there was no reference to more than one or two decisions bearing upon it. Since the decision of *Creighton* v. *Manson*, notwithstanding the pressure of the business of the Court, we have assumed the duties of counsel, as well as of the Court, and explored the numerous volumes of reports of decisions in our sister States for authorities upon the point, and as the result of these labors have found many recent well considered

cases, in which the provisions of the several State Constitutions bearing upon the subject have been analyzed with great severity, and the questions arising discussed and illustrated with marked ability. After a more thorough investigation of the question, and a full consideration of the recent cases, we are free to confess that our own views have been somewhat modified. For these reasons, among others, we shall proceed to the discussion of the subject as if the questions were new in this State, without further reference to *Creighton* v. *Manson*.

The improvement of a public street in a city, to be thereafter used and controlled by the public, is undoubtedly a public work. But it is equally clear, as a general proposition, that the improvement of a street is more beneficial to the local public, or the immediate district in which it is located, than to the whole city, as the improvement of the streets of a city is more beneficial to the city in which they are located than to the State at large. But this fact renders the work no less one of a public character. The work of improving streets being one of a public character, it is insisted by appellant, that the power of the Legislature to pass a law imposing the burden of paying the expenses of the improvement upon the property of the citizen, if it exists at all, must be deduced from one of two sources.

Firstly—The right of eminent domain under which private property may be taken for public use; or,

Secondly—The sovereign right of taxation. And in this he is undoubtedly correct. It is further insisted, that if the power is referable to the former—the right of eminent domain —the law in question directing the assessment to be made according to frontage—by the front foot—is repugnant to section eight of Article I of the Constitution, which contains the provision, " nor shall private property be taken for public use without just compensation." If referable to the latter— the sovereign right of taxation—that the assessment is unequal, and not levied in proportion to the value of the property, and that the law, for this reason, is repugnant to the provisions of section thirteen, Article XI of the Constitution,

which says, that " taxation shall be equal and uniform throughout the State. All property in this State shall be taxed in proportion to its value, to be ascertained by law."

It is plain that a determination, at the threshold of the discussion, of the question, as to which of these sources of sovereign power, the authority of the Legislature over the subject must be referred, is essential to an intelligent consideration of the propositions submitted. Were it not for the fact, that, in some of the earlier cases, there are some loose expressions and dicta which give countenance to the opposite opinion, it would seem to be clear, that assessments for improvements, upon whatever principle distributed, are not taking private property for public use, within the meaning of these terms as used in the Constitution. In these cases money, and money only, is taken. In a certain sense money is property. But it might just as well be said, that money taken by general taxation for the ordinary purposes of State revenue is property within the meaning of the Constitution, and cannot be taken without compensation. The theory of all taxation is, doubtless, in a general sense, that there is compensation for the taxes taken in the protection and security to life, liberty and property afforded by the Government supported by the money raised. But this, manifestly, is not the compensation to be made for property taken for public use, within the meaning of the terms as used in the section of the Constitution cited. The property referred to in the Constitution for which special compensation must be made, is something other than money, as where land is taken to be used as a street, and the like, and the compensation referred to, doubtless, means a compensation in money, the only medium by which special compensation can be accurately measured and adjusted; and to make such compensation in the case of assessments to raise money for the purpose of paying for grading streets, would be to take the money from the property holder with one hand and return it with the other; and this would leave nothing for the purposes required.

The difference in the operation of these two sovereign powers

is stated with great clearness and precision in the very able and satisfactory opinion of Mr. Justice Ruggles, in *The People* v. *Mayor of Brooklyn*, 4 Comst. 420. He says (pp. 423, 424 :) " I perceive no great difficulty in pointing out the distinction between these two powers. Taxation exacts money or services from individuals as, and for, their respective shares of contribution to any public burden. Private property taken for public use by right of eminent domain is taken not as the owner's share of contribution to a public burden, but as so much beyond his share. Special compensation is therefore to be made in the latter case, because the Government is a debtor for the property so taken ; but not in the former, because the payment of taxes is a duty and creates no obligation to repay otherwise than in the proper application of the tax. Taxation operates upon a community or upon a class of persons in a community and by some rule of apportionment. The exercise of the right of eminent domain operates upon an individual, and without reference to the amount or value exacted from any other individual or class of individuals. Keeping these distinctions in mind, it will never be difficult to determine which of the two powers is exerted in any given case."

" It may be proper here, although not strictly necessary, to express the opinion that money cannot be exacted by the Government by the right of eminent domain, excepting, perhaps, for the direct use of the State at large, and when the State at large is to make the compensation. The exigencies of a State Government can seldom require the taking of money by virtue of this power, even in time of war, and never in time of peace. The framers of the Constitution could not have intended to delegate to municipal corporations the right of taking money under this power, because it is entirely unnecessary. Money can always be had by taxation ; lands cannot ; and therefore lands may be taken by right of eminent domain, but money may not. The seventh section of Article I of the Constitution confirms this construction of the power. It directs the compensation for private property so taken to be ascertained by a jury or by commissioners. This is an appro-

priate mode when lands or goods are taken, because their value is uncertain ; but not when money is taken, because its value is already fixed. The validity of the assessment in question, therefore, cannot be maintained as an exercise of the power of eminent domain; and it cannot be maintained at all unless it be a legitimate mode of taxation."

Whatever uncertainty there may have been found in the prior decisions as to the true source of the power of the Legislature to impose this class of burdens upon the citizen, there has been no doubt upon that point expressed since the promulgation of the decision in *People* v. *Mayor of Brooklyn.* In every decision we have met with in our researches rendered since that time, the opinion in that case has been recognized as a correct exposition of the law upon this point. (*Brewster* v. *City of Syracuse,* 19 N. Y. 118 ; *Scoville* v. *City of Cleveland,* 1 Ohio St. R. 135 ; *Hill* v. *Higdon,* 5 Ohio St. R. 245 ; *N. I. R. R. Co.* v. *Connelly,* 10 Ohio St. R. 162 ; *Malony* v. *City of Marietta,* 11 Ohio St. R. 638 ; *Reeves* v. *Treasurer of Wood County,* 8 Ohio St. R. 335 ; *Weeks* v. *Milwaukie,* 10 Wis. 256 ; *Garrett* v. *City of St. Louis,* 25 Mo. 508 ; *Newby* v. *Platte County,* Ib. 259 ; *Williams* v. *Cammack,* 27 Miss. 222 ; *Williams* v. *Mayor of Detroit,* 2 Mich. 279 ; *Municipality No. 2* v. *White,* 9 Lou. Ann. 452 ; *Mayor of Baltimore* v. *Green Mount Cemetery Co.* 7 Md. 536 ; *Nichols* v. *Bridgeport,* 23 Conn. 206 ; *State* v. *City of Newark,* 3 Dutcher, 191, 193.) This point was so ruled by the late Supreme Court in *Burnett* v. *Mayor of Sacramento,* 12 Cal. 82, and *Hart* v. *Gaven,* Ib. 477. And were it not for the fact that this question has been much discussed, and that it is continually raised and pressed upon our notice, whenever there is a slight variation of circumstances or a change in the principle of apportionment, we should not have thought it necessary to do more than refer to the last two cases as settling the question in this State. Some confusion of ideas may formerly have arisen from a supposition that an apportionment according to benefits involved the principle of specific compensation for property taken, and still more from not separating and keeping distinctly in view

the operation of the two powers in that class of cases involving both; as, where land had been taken for a new street, and at the same time an assessment made upon the owners of the property in the district embracing the new street, including the owner of the land taken, to pay for the land thus appropriated. There are such cases, and in these instances both powers may be called into action. Compensation must be made for the land appropriated under the power to take private property for public use, and a sum must also be levied under the right of taxation to make the compensation. The owner of the land in such cases would be liable to pay his share of such tax, and thus the amount ultimately received would only be the balance after deducting the amount of the assessment from the amount of compensation. But, if these distinctions are kept in view, it will be found in all cases of assessments for improvements, whether the sum to be raised is apportioned according to benefits, according to value, upon the front foot, square foot, square acre, or where each party is required to pay for the improvement in front of his own land, the assessment must be referred to the taxing power, and these different modes are only different modes of making the apportionment and not the exercise of different sovereign powers. In the language of Mr. Justice Ruggles, "They all operate upon a community, or upon a class of persons in a community and by some rule of apportionment," and not "upon an individual, without reference to the amount or value exacted from any other individual or class of individuals." And they exact—in theory at least—money or services from individuals, as and for their respective shares of contribution to the local public burden, and not as so much beyond their share; and these various modes of apportionment are only the means by which the law endeavors to ascertain that share.

The assessment in this case was made upon the front foot, and, as we have seen, was an attempt to exercise the sovereign right of taxation, and not to appropriate private property to public use under the right of eminent domain.

45

In the expressive language of Mr. Justice Ruggles, which we again adopt: "If there be any sound objection to the assessment as a tax, it must be an objection which applies to the principle on which the tax is apportioned; because the object for which the money was to be raised is, without dispute, one for which taxation by a different rule of apportionment would have been lawful. It remains to be seen whether anything can be found in the Constitution; in legal adjudication; in the practice of the Government, or in the nature of things, by which taxation upon this principle of apportionment can be judicially annulled. For the purpose of ascertaining what has been deemed on high authority, the nature and extent of the power of taxation vested in the Legislatures of the State Governments, I refer to the opinion of the late Chief Justice Marshall, in the case of *The Providence Bank* v. *Billings*, 4 Peters, 514, 561, 563.

" 'The power of legislation, and consequently of taxation, operates on all the persons and property belonging to the body politic. This is an original principle, which has its foundation in society itself. It is granted by all for the benefit of all. It resides in the Government as part of itself, and need not be reserved where property of any description or the right to use it in any manner is granted to individuals or corporate bodies. However absolute the right of an individual may be, it is still in the nature of that right that it must bear a portion of the public burdens; and that portion must be determined by the Legislature. This vital power may be abused, but the interest, wisdom and justice of the representative body, and its relations with its constituents, furnish the only security against unjust and excessive taxation, as well as against unwise legislation.' And again, in *McCulloch* v. *Maryland*, 4 Wheat. 428, the following observations are found, coming from the same high authority: 'It is admitted that the power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised on the object to which it is applicable, to the utmost extent to which the Government may choose to carry it. The

only security against the abuse of this power is found in the structure of the Government itself. In imposing a tax the Government acts upon its constituents. This is, in general, a sufficient security against erroneous and oppressive taxation. The people of a State therefore give to their Government a right of taxing themselves and their property ; and as the exigencies of the Government cannot be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the Legislature and the influence of the constituents over their representatives to guard them against its abuse.' And again, at page 430, he speaks of it as ' unfit for the judicial department to inquire what degree of taxation is the legitimate use, and what degree may amount to the abuse of the power.' "

" Assuming this, as we safely may, to be sound doctrine, it must be conceded that the power of taxation, and of apportioning taxation, or of assigning to each individual his share of the burden, is vested exclusively in the Legislature, unless this power is limited or restrained by some constitutional provision. The power of taxing and the power of apportioning taxation are identical and inseparable. Taxes cannot be laid without apportionment; and the power of apportionment is therefore unlimited, unless it be restrained as a part of the power of taxation."

This doctrine is sustained by a uniform line of decisions in our own and our sister States. (See *People ex rel. Attorney-General* v. *Pacheco*, 27 Cal. 209, and cases cited.)

Is the principle upon which this assessment is made repugnant to the provisions of section thirteen of Article XI? If not, then, there is no provision that limits the power of the Legislature with respect to the principle upon which the apportionment of such burdens shall be made. The section reads:

" Taxation shall be equal and uniform throughout the State. All property shall be taxed in proportion to its value, to be ascertained as directed by law ; but Assessors and Collectors

of town, county and State taxes shall be elected by the quali-
fied electors of the district, county or town in which the prop-
erty taxed for State, county or town purposes is situated."

If the term taxation is here used in a sense co-extensive
with the sovereign power under which the right is exercised,
or, if it is to be considered abstractly, without reference to
the long and well established meaning of the words taxes and
assessments, as used in the statutes and ordinary language of
the several States, to indicate different classes of public bur-
dens—the one imposed for general revenue for the purposes of
the ordinary expenses of the State, county and town govern-
ment, and the other to raise a special fund to defray the
expenses of public improvements mainly locally beneficial—
then, the term is broad enough to embrace assessments of the
kind in question. But terms often, by general use, acquire,
when employed in certain relations, a more limited significa-
tion. And this is true with reference to the signification in
which words are used in statutes and Constitutions, as well as
in common parlance. The use of the terms taxes, taxation
and assessments affords, perhaps, as striking illustrations of
this principle as any to be found in the language. The term
taxation, both in common parlance and in the laws of the
several States, has been ordinarily used, not to express the
idea of the sovereign power which is exercised, but the exer-
cise of that power for a particular purpose, viz: to raise a
revenue for the general and ordinary expenses of the govern-
ment, whether it be the State, county, town or city govern-
ment. But there is another class of expenses, also of a public
nature, necessary to be provided for, peculiar to the local gov-
ernments of counties, cities, towns and even smaller subdi-
visions, such as opening, grading, improving in various ways,
and repairing highways and streets, and constructing sewers
in cities, and canals and ditches for the purpose of drainage
in the country. They are generally of peculiar local benefit.
These burdens have always, in every State, from its first settle-
ment, been charged upon the localities benefited, and have

been apportioned upon various principles; but whatever principle of apportionment has been adopted they have been known, both in the legislation and ordinary speech of the country, by the name of assessments. Assessments have also, very generally, if not always, been apportioned upon principles different from those adopted in taxation, in the ordinary sense of that term; and any one can see, upon a moment's reflection, that the apportionment, to bear equally, and do substantial justice to all parties, must be made upon a different principle from that adopted in taxation, so called. This will be manifest upon considering the following passage from the opinion of Mr. Justice Ruggles, in the case before cited:

"A property tax (we will add, according to value) for the general purposes of the government, either of the State at large or of a county, city or other district, is regarded as a just and equitable tax. The reason is obvious. It apportions the burdens according to the benefit more nearly than any other inflexible rule of general taxation. A rich man derives more benefit from taxation in the protection and improvement of his property than a poor man, and ought, therefore, to pay more. But the amount of each man's benefit in general taxation cannot be ascertained and estimated with any degree of certainty, and for that reason a property tax is adopted instead of an estimate of benefits. In local taxation, however, for special purposes, the local benefits may in many cases be seen, traced and estimated to a reasonable certainty. At least, this has been supposed and assumed to be true by the Legislature, whose duty it is to prescribe the rules on which taxation is to be apportioned, and whose determination of this matter, being within the scope of its lawful power, is conclusive."

The different significations of the terms taxes and assessments, before referred to, will be found, upon examination, to be well established in the legal language of the several States, and to run through the statutes, and to have been recognized and enforced by the various judicial tribunals of the country; and, as we shall see, have found their way into the Constitu-

tions of many of the States, our own among the number. Thus, *In the matter of Mayor of New York* for improving Nassau street, a church which had been assessed for the improvement, claimed exemption under the statute, which provided that " no real estate belonging to any church shall be taxed by any law of this State." The Court held that the provisions referred to general or public taxes to be levied and collected for the benefit of the town, county or State at large, and that a street assessment was not such a tax as the Act contemplated. (11 John. 77 ; 4 Comst. 433.) In *The State* v. *City of Newark*, 3 Dutcher, 187, the city had levied an assessment to a large amount for improving Market street, upon the property of the New Jersey Railroad and Transportation Company. The railroad company claimed exemption under their charter, which provides that the company " shall pay a tax of.one half of one per cent upon their capital stock, and that no other or further tax or impositions shall be levied, or imposed upon the company." This assessment was held not to be a tax within the meaning of this provision of the charter. Yet it is expressly held that " the assessment in this case is a clear exercise of the taxing power. It is made for a public purpose, and confers no special benefits upon the property of the company." (Page 191.) There are other decisions in the same State to the effect that such assessments are not taxes within the meaning of that term as used in the various statutes. So also in *The Mayor and City Council of Baltimore* v. *The Proprietors of Green Mount Cemetery*, 7 Maryland, 517, the charter of the company provided that the land appropriated as a cemetery should " not be liable to any tax or public imposition whatever." An assessment was made for improving the street in front of the premises of the company, and the payment was resisted on the ground of exemption under this provision of the law. The Court, " on the fullest consideration," hold the assessment valid, and say : " We think the Legislature intended nothing more than to exempt the property of the proprietors from all taxes or impositions levied or imposed for the purpose of revenue, and not

to relieve it from such charges as are inseparably incident to its location in regard to other property." (Page 533.) And there are other decisions in the State to the same effect. Yet, in the same case, the Court also say : " That the imposition of a paving tax is an exercise of the taxing power, and not of the right of eminent domain, we entertain no doubt, nor did we understand the counsel for the appellant to suggest any." So also in Missouri, church property was by law exempt from taxation, yet an assessment upon a church for the construction of a sewer was held not to be within the exemption. (*Lockwood* v. *City of St. Louis*, 24 Mo. 21.) So in *Northern Liberties* v. *St. John's Church*, 13 Pa. St. R, where churches were by statute exempt from " all county, borough and city taxes," it was held that the church was not exempt from an assessment levied to defray the expense of laying pipe in the street upon which the church lot fronted for the introduction of pure water. The Court, after stating the specific difference between the two classes of burdens, and the different established significations of the terms taxes, and assessments, say : " It is evident from the face of all the Acts of Assembly in relation to this incorporated district, that the Legislature had in view the difference between taxes, properly so denominated, and charges or assessments for improvement of particular streets as the population required such improvements." (Page 107.) So also in *Canal Trustees* v. *City of Chicago*, 12 Ill. 405, the same principle was sustained. An assessment was made upon certain lands belonging to the Illinois and Michigan Canal, for enlarging and improving an alley, bounded in part by the lands. The thirteenth section of the Act by which the lands were granted to the Trustees provides, that " the lands and lots shall be exempt from taxation of every description, by and under the laws of this State, until after the same shall have been sold and conveyed by the said Trustees, as aforesaid." The Court held the assessment not to be taxation within the meaning of this provision. Mr. Chief Justice Treat said : " In our opinion, the exemption must be held to apply to taxes levied for State, county and municipal pur-

poses." (Page 406.)    These are some of the numerous cases, that go to establish the fact, that, when not used for the purpose of designating the source or extent of the power itself, but only with reference to its exercise, the terms taxation and, assessments, though both are an exercise of the same sovereign power have, in the legislative, judicial and general language of the country, acquired peculiar and more limited significations expressing different specific ideas.˙  Indeed, taxation itself, in its ordinary sense, is, perhaps, not the exercise of a distinct, independent sovereign power, but only one form of exercising the right of eminent domain.  Yet the terms, the right of taxation, and the right of eminent domain are ordinarily used to express different specific ideas, although both are, doubtless, grounded in the same ultimate sovereign power.

We will now consider the signification of these terms as used in the various State Constitutions, including our own, and in doing so, it .must be borne in mind that these terms, also, as used in the several Constitutions, have reference to the exercise of the power.  Constitutions are only laws of superior and paramount authority.  And when the statesmen who frame, and the people who adopt them, employ terms in relation to any particular subject, which have, in that relation, in the legislative, judicial and general language of the country, acquired an established, well known and more limited signification than the word in other relations might indicate, it must be presumed that they intend to use those terms in such established, more limited sense, unless it clearly appears to the contrary by the context.  And in Section 13, of Article XI we think the words "taxation" and "taxed" were used in the same sense as in the various statutes of the States before referred to, and others of a similar character, to signify such general taxation upon all property as is in use in all the States to raise a general revenue for the purposes of defraying the ordinary expenses of State, county and municipal governments. In the language of Mr. Justice Bennett, in *People* v. *Naglee,* 1 Cal. 252 :   "Our Constitution was framed by intelligent and practical men, who were well acquainted with the organiza-

tion and operation of the system of State Governments in all portions of the Union; and when they declared that taxation shall be equal and uniform throughout the State, they must have referred to such general taxation as in the other States is commonly imposed alike upon all property, for the purpose of defraying the expenses of the Government of the State, or of some local municipal corporation." This clause in the Constitution was construed in the same way—all the Justices concurring—in *Burnett* v. *Mayor, etc., of Sacramento,* 12 Cal. 83. Mr. Justice Field said: "The thirteenth section of Article XI of the Constitution does not cover the case. That section provides for equality and uniformity of taxation upon property, but applies, in our judgment, only to that charge or imposition upon property which it is necessary to levy to raise funds to defray the expenses of the Government of the State, or of some county or town. We do not think it has any reference to special assessments for local improvements, by which individual parties are chiefly benefited in the increased value of the property, and in which the public is only to a limited extent interested. For the expense of such improvements, it is competent for the Legislature to provide, either by general taxation upon the property of all the inhabitants of the county or town in which they are made, or upon the property adjacent thereto and specially benefited thereby." The assessment in that case was made upon the adjacent property, according to value, and was, therefore, in accordance with the second clause of the section of the Constitution under consideration; whereas in the present case it is upon the front foot. In this respect the two cases differ. But the question was, whether the term "taxation," as used in that section, is applicable to assessments for street improvements. If the term taxation in the first clause—"taxation shall be equal and uniform"—is inapplicable to a street assessment, of course the term, as used in the second clause of the same section—"all property in this State shall be taxed in proportion to its value"—must also be inapplicable, and the point decided is the same in both

cases.  In *Hart* v. *Gaven*, 12 Cal. 487, under a law requiring the owners of property in San Francisco to repair the streets in front of their property, and in case of default on their part authorizing the Superintendent of Streets to make the repairs, and recover the expense against the owner, an action against the owner for such repairs was sustained.  It does not appear, however, from the report of the case, that any question was raised on the constitutionality of the law on the ground that the apportionment was not according to value.

The construction thus given finds further support from an examination of other clauses of the Constitution.  The same section further provides:  "But Assessors and Collectors of town, county and State taxes shall be elected by the qualified electors of the district, county or town in which the property taxed for State, county or town purposes is situated."  This form of expression would seem to have reference only to taxes for general revenue purposes.  The State, county and town are coupled together without any reference to minor subdivisions for local improvements, etc.  By no reasonable construction can the clause be regarded as pointing to anything other than revenue for general ordinary purposes of governmental expenses; and this clause undoubtedly refers to the same taxes mentioned in the preceding clause, wherein uniform and *ad valorem* taxation are provided for.

Again, there is another material provision of the Constitution, not hitherto noticed in the discussions in this State, relating especially to the local governments, in which the different forms of exercising the taxing power under different names and circumstances, is expressly recognized.  Section thirty-seven of Article IV provides as follows: "It shall be the duty of the Legislature to provide for the organization of cities and incorporated villages, and to restrict their power of taxation, assessments, borrowing money, contracting debts and loaning their credit, so as to prevent abuses in assessments and in contracting debts by such municipal corporations."

*Taxation* and *assessments* are here spoken of and recognized as legitimate modes of exercising power.  The framers of the

Constitution could not have intended to convey the same specific idea by these two terms. If so, they are guilty of unmeaning tautology, and might just as well have said, "taxation and taxation." They must have meant something by the use of the word *assessments* specifically different from *taxation*, as that term was understood by them. They must have contemplated that there is some form of exercising a power different from the ordinary form of taxation, and they assumed that that form was proper, and would actually exist under the Constitution of California. We know, also, that a particular system of imposing charges, with some variation in the principle upon which they were apportioned, for local improvements at that time, and for a long period prior thereto, existed in nearly every State in the Union from which the people of California emigrated, known under the name of assessments. And we know that this section of our Constitution is a *verbatim* copy of a section of the Constitution of the State of New York, where this system had been in use, according to the statement of Mr. Justice Ruggles, in one form or another, for one hundred and fifty years. And we know that substantially the same provision is contained in the Constitutions of several other States where the same system prevails. We may reasonably presume, then, that the terms taxation and assessments were intended to be understood in the sense in which they were used in the State from which the provision was borrowed, and consequently that taxation, as used in our Constitution in relation to a similar subject matter, is not to be regarded as including assessments. The history of the provision, and the mode of its introduction into the Constitution of New York, will be found in the case before cited from 4 Comst. 440. As this system of assessments had no relation to the State at large, or to the general financial affairs of the State, county, or city governments, there was no occasion to refer to it in the general provision relating to taxation, properly so called, for such purposes as were contemplated in Section thirteen of Article XI. But as these local matters are under the control of cities and towns, it was

peculiarly proper to refer to them in a provision relating to such subordinate communities. This constitutional provision upon this particular subject matter now under consideration, has not itself imposed any restriction whatever upon the power to authorize these assessments, but it has simply enjoined the duty of restricting the power upon the Legislature, leaving to its discretion the measure of the restriction. As the framers of the Constitution understood these terms to have different significations, and when they intended to include both systems in a provision, actually employed both terms to express that intention, it is fair to presume that, had they intended to include assessments in the limitation imposed by Section thirteen, Article XI, they would have said, " Taxation and assessments shall be equal and uniform throughout the State." From these considerations it seems impossible, upon the reason of the thing, to reach any other conclusion than that Section thirteen, Article XI, is inapplicable to assessments of the class in question.

Besides, we are not without authority upon this question in our sister States, having similar constitutional provisions, where the subject has been examined and illustrated by eminent Judges with signal ability. We shall now refer to some of the decisions; and, as we propose to discuss the question in this case for the last time, we shall not hesitate to quote largely from some of the first of these opinions, that the grounds upon which they rest may be fully appreciated.

The case of *Scoville* v. *City of Cleveland*, 1 Ohio St. R. 134, arose under the Constitution of 1802, which contained no provision similar to ours. There being no restriction in the Constitution upon the subject an assessment according to benefits was held to be constitutional. The new Constitution of Ohio contained provisions similar to those in the Constitution of California upon the same subject, but not couched in precisely the same language. Under those provisions an assessment per front foot was levied upon property bordering upon a public street to pay the expenses of re-grading and paving the same. The case was, therefore, precisely like the one now under con-

sideration.    In *Hill* v. *Higdon*, 5 Ohio St. R. 246, the Supreme
Court of Ohio held the law under which the assessment was
made to be constitutional and the assessment valid.    In deliv-
ering the opinion of the Court, Mr. Chief Justice Ranney said:
" By the positive terms of the second section of that Article
' laws shall be passed taxing by a uniform rule all moneys,
etc., and also all real and personal property according to its
true value in money.'    In the case of *The City of Zanesville* v.
*Richards*, decided at the present term, we have held that this
section is equally applicable to and furnishes the governing
principles for all laws levying taxes for general ·revenue,
whether for State, county, township or corporation purposes;
and it requires a uniform rate per cent to be levied upon all
property, according to its value in money, within the limits
of the State or the local subdivision for which the revenue is
collected.    The General Assembly is no longer invested with
the discretion to apportion the tax, and to determine upon
what property and in what proportion the burden shall be
laid.    A uniform rate per cent must be levied upon all prop-
erty subject to taxation, "according to its true value in money,'
so that all may bear an equal burden.    If laws of the charac-
ter of those now under investigation are controlled by this
section, it is evident they cannot be sustained.    They do not
impose the tax upon all the property of the city or village,
nor is it apportioned according to the true value in money of
the property upon which it is laid.    As the mode prescribed
in this section is sufficient to enable municipal corporations to
raise a revenue for the accomplishment of all their legitimate
purposes, had the Constitution contained nothing further to
evince the intention of its framers, it might be argued (and, I
think, conclusively) that any other mode of levying taxes for
any purpose was necessarily excluded.    But it does contain a
further provision, which every sound rule of construction binds
us to regard, and which seems utterly inconsistent with such a
conclusion.    By the sixth section of the thirteenth Article the
General Assembly is required to provide for the organization
of cities and incorporated villages by general laws, and to

restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent the abuse of such power. It is very clearly our duty to give effect to the natural and obvious import of the language of this section. It relates to the organization of cities and villages, and imposes upon the General Assembly the very important duty of so restricting the powers it was supposed they would possess as to prevent their abuse. Amongst these is the power of ' assessment.' This power had for many years been in constant and active exercise in every part of the State and was perfectly understood by every member of the Convention. The popular as well as legal signification of this term, had always indicated those special and local impositions upon property in the immediate vicinity of an improved street, which were necessary to pay for the improvement, and laid with reference to the special benefit which such property derived from the expenditure of the money. They had always differed widely from the ordinary levies made for the purpose of general revenue. To confound them now, in giving a construction to the second section of the twelfth Article, is to make not only unmeaning but utterly absurd, a material part of the sixth section of the thirteenth Article. To restrict or regulate the exercise of a power, furnishes the strongest possible implication of its existence, and to impose upon the General Assembly the duty to do this, in respect to a power which did not exist, or which had been expressly prohibited, would be nothing better than nonsense.

"It is our duty to give such a construction to the Constitution as will make it consistent with itself, and will harmonize and give effect to all its various provisions. To do this, we have only to suppose that the Convention used language with reference to its popular and received signification ; and applied it as it had been practically applied for a long series of years. That where taxation is spoken of in the second section of the twelfth Article, reference is made to the general burdens imposed for the purpose of supporting the Government, and the revenue raised expended for the equal benefit of the public

at large; while the power of assessment, referred to in the sixth section of the thirteenth Article, although resting upon the taxing power, was intended to describe a distinct and well known mode of laying a local burden upon particular property, with reference to the peculiar and special benefit derived to such property from the expenditure of the money.   The general language of the first of these sections is thus only so far restricted as to give effect to the specific provision contained in the last.  · By the first, as the money is raised and expended for the equal benefit of all, no discretion is left with the General Assembly; but the tax must be levied equally upon all property, and according to its true value.   But in the exercise of the power of assessment, legislative discretion in apportioning the burden according to benefits is left as broad and unfettered as under the .Constitution of 1802.   The last of these sections contemplates a delegation of the power to municipal corporations, and imposes upon the Legislature the duty (as yet very imperfectly performed) of so restricting its exercise as to prevent abuse.   A failure to perform this duty may be of very serious import, but lays no foundation for judicial correction.

'" The language of this section furnishes very strong evidence that the Convention carefully discriminated between taxation and assessment, and regarded them as distinct modes of raising money for different purposes, and upon different principles, from the fact that both terms are employed, and both are required to be restricted when used by cities and villages. The origin and history of the section lead to the same conclusion.   It is almost a literal copy of the ninth section of the eighth Article of the Constitution of New York.   From the case of *The People* v. *The Mayor, etc., of Brooklyn,* 4 Com. 440, it appears that this mode of taxation had been much complained of in that State, and that an attempt was made in the Convention of 1846 to effect its abolition.   To this end the subject was referred to a committee, who reported a section for that purpose.   But the Convention refused to adopt it, and finally incorporated the provision as it now stands in

the Constitution of that State, and as it is found in ours. Upon this provision Judge Ruggles remarks: 'Instead of abolishing the system of assessments, this section of the Constitution refers it to the Legislature for the correction of its abuses. The direction given to restrict the power of cities and villages to make assessments, presupposes and admits the existence of a power to be restricted. The Constitution, therefore, in this section recognizes and affirms the validity of the legislation by which city and village assessments for local purposes, like that now in controversy, are authorized, and seems to remove all doubt in relation to the legislative power in question.'

"It cannot be supposed that those who borrowed this provision from the New York Constitution were ignorant of the objects and purposes for which it was there adopted; and it is but fair to presume that it was intended to effect the same purposes and objects here. In our present Constitution, as well as in the former, the general grant of legislative authority includes the power of taxation in all its forms. Restrictions upon its exercise are to be looked for in other parts of the instrument. The second section of the twelfth Article has established the principle upon which all taxes for general revenue purposes must be levied; but it does not extend to what was then and is still well known as special assessments, because the sixth section of the thirteenth Article shows that they were not intended to be included. Dealing with them under the name of 'assessments,' the people have contented themselves with enjoining upon the Legislature the duty of preventing abuses by restricting the power of the cities and villages to impose them."

This decision was affirmed in *Reeves* v. *Treasurer of Wood County*, 8 Ohio St. R. 337, in a case arising out of assessments made for the purpose of draining farming lands in the lowlands of northwestern Ohio. The assessment in this case was according to benefits. Again, in *Northern Indiana R. R. Co.* v. *Connelly*, 10 Ohio St. R. 162, the constitutionality of a similar Act relating to street improvements was upheld. And

the Court say : "That such assessment may be made in proportion to the front foot as well as upon the value of the lands, as assessed for taxation." And again in *Maloy* v. *City of Marietta*, 11 Ohio St. R. 637.

The Constitution of Wisconsin contains provisions similar to our own upon the subject under consideration. And the section corresponding to Section thirty-seven of Article IV is in nearly the same language. Notwithstanding these provisions it was held, in *Weeks* v. *Milwaukie*, 10 Wis. 259, that a law which "requires every lot owner to build whatever improvements the public may require, on the street in front of his lot, without reference to inequalities in the value of the lots, in the expense of constructing the improvements, or of the question whether the lot is injured or benefited by their construction," is constitutional. After discussing the point at some length and presenting some further views, which we will not take up further space in quoting, the case of *Hill* v. *Higdon* is cited with approbation, and Mr. Justice Payne says : "The reasoning of Mr. Chief Justice Ranney upon the question I think it impossible to answer." (P. 261.)

The Constitution of Michigan also contains similar provisions, though not identical in language, and the term assessment is omitted in the provision corresponding to Section thirty-seven of Article IV, in ours. In *Williams* v. *The City of Detroit*, 2 Mich. 564, a law authorizing assessments for street improvements upon the lots fronting upon the street improved, was held to be constitutional. It would seem that the law in this case required the expense of the improvement in front of the lot to be assessed upon the lot, like the law of Wisconsin in the case just cited. At all events, this was the case in *Woodbridge* v. *The City of Detroit*, 8 Mich. 276, in which case all the Judges concurred in holding that a law apportioning the assessment per front foot would be constitutional, and approved of *Hill* v. *Higdon*, 5 Ohio. But, while two of the four Judges held the law in question in the case then under consideration to embody the same principle, and

47

to be constitutional, the other two Judges thought, that, because a single lot was required to bear the entire expense of an improvement in front, there was no apportionment at all, and that this element of a tax, viz : apportionment, was wanting, and for this reason that the law could not be sustained. They concurred with the other Judges, however, as we understand them, on the proposition that whenever there is an apportionment, no matter upon what principle made, the law can be sustained under the Constitution of Michigan.

Similar laws have also been repeatedly sustained in Missouri under a Constitution which contains the provision, " That all property subject to taxation in this State, shall be taxed in proportion to its value," but does not contain a provision corresponding to Section thirty-seven, Article IV of the Constitution of California.    In the *Egyptian Levee Company* v. *Hardin*, 27 Mo. 495, the question arose under an Act authorizing a corporation formed to reclaim lands in a certain designated district subject to inundation by constructing levees and digging canals, to raise the funds necessary for the work by assessing the sum of one dollar per acre upon the owners of the lands within the district embraced within the charter. The law was sustained.    The Court say : " That provision of our State Constitution which requires taxation to be proportioned to the value of the property on which it is laid, is only applicable to taxation in its usual, ordinary and received sense, and is therefore limited to taxation for general purposes alone, where the money raised by the tax goes into the State Treasury, County Treasury, or the General Fund of some city' or town, and is applicable to any purpose to which the legislative body of such State, county or town may choose to apply it ; and is not intended to apply to local assessment where the money raised is to be expended on the property taxed.    These local assessments are not necessarily, under our Constitution, apportioned by reference to the value of the property assessed, but may be regulated by the value of the benefit which the improvement to which the money is devoted is expected to confer on the proprietor."

This conclusion seems to have been attained by reasoning upon principle, without the aid of any of the cases before cited in this opinion arising under similar constitutional provisions in other States, as none of them are referred to by the Court. Various cases were however cited construing the term taxation, as used in statutes. This case was affirmed in *City of St. Joseph* v. *Anthony,* 30 Mo. 541, where a street was macadamized, and the cost of the work " borne by the owners of the adjoining property, and apportioned and charged on the adjoining lots in proportion to their front." The principle had been recognized in the earlier case of *Garrett* v. *St. Louis,* 25 Mo. 509, 510, but the decision in that case was not put squarely upon this ground. This view was also foreshadowed in *Newby* v. *Platte County,* Ib. 272. And in *Inhabitants of Palmyra* v. *Morton,* Ib. 594, an assessment upon a lot of the entire cost of paving the street in front of the lot was held to be constitutional, but in this instance the decision was put upon the police powers. When these last cited but earlier cases were decided, the Court, although it had caught a view of the true ground, does not appear to have settled down upon the true and solid basis of construction.

We shall notice but one other decision upon this point, that in *Municipality No. 2* v. *White,* 9 Lou. Ann. R. 450, arising under the following provision in the new Constitution : " Taxation shall be equal and uniform throughout the State. All property on which taxes may be levied in this State shall be taxed in proportion to its value, to be ascertained as directed by law." An assessment for improvements, apportioned according to benefits, was held by three of the Justices to be repugnant to the provision of the Constitution just cited. Two Justices dissented. This was comparatively an early decision under these recent provisions in Constitutions, and the Court did not have the benefit of the discussions on the subject found in the cases before cited. After having determined that the power of enforcing assessments for improvements must be referred to the sovereign right of taxation, the Court seem to have taken it for granted that the term taxation, as used in the

Constitution, must be interpreted as covering the entire field embraced by the power.   Its attention does not seem to have been directed to the more limited sense which the term taxation has acquired in the legal and general language of the country.   Besides, we do not find any provision in the Constitution of Louisiana corresponding to Section thirty-seven of Article IV of our own, and the grounds of the argument based upon that provision were wanting.   So, also, the civil law is the basis of the code of that State, and we cannot undertake to say in what respect their system of making local improvements may have differed from that prevailing in the other States, and if it materially differed, to what extent the practice under that system may have operated to modify the views of the Judges.   Nor whether the term taxation, in its legal and ordinary use in that State, had acquired a more comprehensive signification than in other States.

The result of our investigation is, that there is no restriction in our Constitution upon the power of the Legislature to impose assessments to defray the expenses of public improvements in the nature of grading and planking streets, upon the property supposed to be benefited thereby in any district designated by the Legislature, or the proper officers of municipal governments acting under the authority of law.   And that it is authorized to apportion the amount to be raised according to value, according to the benefits received, in proportion to frontage or the superficial contents, or to adopt any principle of apportionment that can be referred to the general sovereign right of taxation as defined by Mr. Justice Ruggles, in *People v. Brooklyn.*   We think this construction of the provisions of the Constitution in question based upon solid reasons; and that the arguments in support of it in the cases cited are impregnable.   The chain of authorities in support of this view, also, so far as we have been able to find them, is unbroken, unless the case in Louisiana can be considered an exception.

The matter rests, then, in the discretion of the Legislature. But it is difficult to say which principle of apportionment

would, upon the whole, most nearly approximate equality, and do exact justice to all. It would not be difficult to show that the *ad valorem* principle might in many instances work monstrous injustice; and it may be questionable whether, upon the whole, it is not more unequal and unjust in its operation than the front foot, or any other mode of apportionment. In many cases either principle of apportionment would, doubtless, approximate equality and uniformity sufficiently near to answer all the purposes of justice. In some cases an apportionment according to benefits, and in others an *ad valorem* or front foot apportionment might better answer the ends of justice. But every principle upon which these burdens have been apportioned has been in turn attacked as unequal and unjust. And such, from the nature of things, must continue to be the case where one uniform system is inflexibly followed. In the language of Mr. Justice Napton, 27 Mo. 498 : "In every form of taxation, whether general or local, it is certainly desirable and proper that the burden should be distributed as near as may be in proportion to the benefit derived ; and constitutional injunctions and restrictions, where they have been attempted on this subject at all, are designed to promote this end. But where there is an absence of constitutional provisions, it is not in the power of the Courts to enforce any fancied scheme of equality seeming to them more just than the one adopted by the Legislature. The latter department of government is wisely intrusted with the entire control of this subject; and if practical injustice is done, the remedy is in the hands of the people. Equality of taxation may, however, be regarded as one of those utopian visions which neither philosopher nor legislator has ever yet realized. Approximation may be arrived at, and ought to be, and to a reasonable extent attained ; but such is the infinite variety and complexity which human transactions assume, that it surpasses the ingenuity of the political economist and practical politician to foresee exactly where and how the pressure of a proposed tax will fall."

Possibly it might tend to promote equality and justice to leave to the local communities, which have the supervision of

this class of improvements, the discretion to adopt that principle of apportionment which the exigencies of each particular district designated for improvement may require. In this State, particularly with reference to the City of San Francisco, nearly, if not quite all the various modes of apportionment have been tried, and among them the *ad valorem* principle was for several years pursued. Each was in turn attacked as unjust, and abandoned. Under the first charter of San Francisco one third of the expense was paid out of the City Treasury, and two thirds "paid in equal proportions by the land on both sides of the street," etc., but the principle of apportionment is not indicated. Under the charters of 1851 and 1855 the apportionment was according to benefits. The great reform charter—the Consolidation Act of 1856—adopted the front foot principle, and this continued in force till 1859, when it was amended and an *ad valorem* apportionment adopted. After trying this system two years, and after having given each principle a fair trial, in 1861 the Legislature again returned to the front foot principle, which had been in force from 1856 to 1859, the only instance of a return to a principle once tried and abandoned. And finally in 1862—after twelve years experience—the present principle of assessing upon the front foot was continued, and for reasons which must be presumed to have been satisfactory to the Legislature. But whether the principle is a wise one or not is no concern of ours. The question of power having been determined in favor of the action of the Legislature, the duty of determining the proper principle to be adopted is devolved upon that body, and its determination is conclusive. The fact that the *ad valorem* principle has been after a thorough trial abandoned, and that there has been a return to the front foot principle is, however, some evidence that the former operates unjustly and the latter more equally. It must be manifest to any one who will reflect upon the subject that any constitutional restriction upon the legislative discretion as to the principle upon which the apportionment shall be made would have been unwise in the extreme, not to say absolutely absurd.

With these observations we leave the matter, and those who desire to pursue the discussion further can do so by consulting the cases cited.

The further defense consists of various alleged defects and irregularities in the proceedings, through which the defendant is sought to be charged.

The proceedings in question were initiated by the Board of Supervisors on the 4th of August, 1862, by passing the following resolution, declaratory of their intention in the premises, pursuant to the provisions of Section three, Article IV of the Consolidation Act, as amended in 1862:

"*Resolved*, That it is the intention of this Board to order the following street work: That Fremont street, from Mission to Howard streets, be graded and macadamized."

The defendant urges two objections to this resolution : Firstly, that the Board had no power under the statute to declare their intention to grade and also to macadamize a street in the same notice or resolution; secondly, that the resolution does not sufficiently describe the work intended to be done.

We do not think either of these objections is well founded. We find no provision in the Act which in terms or by necessary implication requires the Board to pass a separate resolution for each kind of work which they are empowered to order to be done under the provisions of the third section of Article IV. Nor can we perceive in reason or policy why such a course should be required. The sole purpose of the resolution and its publication, as required in section four, is to notify property holders that the Board are about to improve a given street, or some part thereof, by causing certain kind or kinds of improvements to be made, in order that they may have an opportunity to oppose the improvements in the manner prescribed in the Act, if they desire to·do so. Suppose the Board intended to order all the different kinds of work requisite to the full improvement of a street upon a given plan to be done, what sense or reason, in the absence of an express and clear provision to that effect, is there in requiring them to pass and

publish a separate resolution for each kind of work when, as to all parties concerned, it can be as well if not better done in a single resolution setting forth in connected detail all the improvements intended to be made? Such, it seems to us, would be the more orderly and systematic method, and therefore most advisable.

But it is contended that the Board cannot be allowed to join two or more kinds of work in the same notice, because by so doing the property holder may be debarred of his right of protest, as provided in the fourth section in case there should be one or more kinds included as against which he is not allowed to protest. There is no force in this reasoning for the conclusion attempted to be drawn does not follow. Assuming that the property holder can protest against grading, but cannot against macadamizing, it does not follow that he cannot protest against the former because the latter is included in the notice. If he has the right to protest against a particular kind of work the proceedings can take on no form by which he can be deprived of that right, nor is he deprived thereof by a notice like the present, nor is the exercise of the right, in any way which we can perceive, thereby impeded or impaired.

Construing the resolution (as it is construed by counsel for· the defendant) as declaring an intent to both grade and macadamize (which, however, is not the sense in which we read it, as will appear hereafter,) we also think that it satisfies the statute upon the question of description. The kind of work is sufficiently described by the use of the terms " graded and macadamized." The description of the work which the fourth section of the Act calls for is given in the third section, in which each kind of work which the Board is authorized to order is set forth and described. The Board are not required to describe the work with any more exactness than it is described by the law itself. When the Board say they intend to grade a certain street, they have said all that is needed by way of description. No property holder can be in doubt as to what is to be done. He knows that the street is to be so filled in or excavated, as the case may be, as to make it con-

form to the official grade of the city; all of which the word grade itself imports, and the description of the work would have been no better or more complete had this definition of the term been employed instead of the term itself. The notice is to be read to the property holder in the light of the law which confers the power upon the Board, for that law is, so to speak, a part of the notice. By that law he is informed that the Board can only grade a street to the official grade of the city, and he is therefore fully informed as to what the Board intended to do, and he has no right to assume that they intend to make a grade not authorized by law and use the assumption as a foundation upon which to ground an objection to the notice.

The next objection to these proceedings is that the contract contains no provision to the effect that the material to be used shall be such as may be required by the Superintendent of Public Streets as directed by law. Upon this subject the statute provides that " the materials used shall be such as are required by the said Superintendent, and all contracts made therefore must contain this provision."

The contract, which was duly executed by the plaintiff and Superintendent of Streets, provides that the plaintiff " will do and perform, under the direction and to the satisfaction of the Superintendent, and with materials to be furnished by the said Joseph S. Emery, all the work, etc., according to the specifications hereto annexed." Among the specifications thus made a part of the contract is found the following: " The above named portion of Fremont street is to be macadamized with rock from Goat Island," etc. So it would seem that the Superintendent required that the material used should be Goat Island rock, and the contract was accordingly so drawn as to make it obligatory upon the contractor to furnish the material so required by the Superintendent. We think this not merely a sufficient but a most substantial compliance with the provision of the statute above quoted. The contractor is made to furnish and agrees to furnish a specified kind or qual-

48

ity of material, which is the kind for which the Superintendent has expressly stipulated, and thereby required within the meaning of the law. The object of the law was to secure the use of such materials as the Superintendent might select. It cannot be denied but that this object was most effectually attained under the contract in this case.

The next and last objection urged is that the contract varies from the terms of the resolution of intention and subsequent order in pursuance thereof, because the latter require Fremont street to be graded and macadamized from Mission to Howard, while the former calls for grading and macadamizing that block " except where done."

In considering this point it is important to determine in the first place what is the true intent and meaning of the resolution of intention and subsequent order of the Board. They, like all other instruments, are to be read in the light of surrounding circumstances. It appears that at the time the resolution was passed the street in question was already graded to the official grade of the city—there could, therefore, be no sense in requiring that to be done which was already done. Upon the subject of grading, it would seem, the Board had either previously exercised its power or there had been no occasion for its exercise. It further appears that when a street, which is about to be macadamized, is already graded to the official grade, it is necessary, in order to preserve the official grade, to remove the surface to a depth equal to the thickness of the rock and other materials used in macadamizing. It is also necessary to round up the street toward the centre. This excavating and rounding up may, in one sense, be called grading, but it is not what is meant by that term as used in the third section of the Act in question. Thus there is a certain amount of grading always required as incidental to the macadamizing process, but such grading is regarded as a part of that process and not as constituting a distinct and separate kind or class of street work. In view of these circumstances, therefore, we understand the Board as using the term with reference to this latter grading which is incidental to the work

of macadamizing, and, out of an abundance of caution for the purpose of guarding against any claim for the grading in question as something apart from that work. The same form of expression was carried into the contract, yet it was understood as referring only to the macadamizing, for no bid or charge was made for grading as such, although the contractor performed all of the work of that character which was required in order to macadamize the street.

By the same process of reasoning the objection that the contract excepts a part of the block, whereas the resolution and order of the Board directs the whole to be macadamized, is met and answered. The Board do not in terms propose to re-macadamize any part of the block, and if a portion was already macadamized their declaration must be read in the light of that fact, and construed as embracing only such portions as were not macadamized. But independent of this the notice is not thereby vitiated because it calls for more work than the contract does. It is nevertheless a good notice for that part which the contract does call for, which is all that is required.

In order to charge the property holder it was necessary to show that the Board had duly declared their intention to have the identical work done for which he is sought to be charged and thereafter ordered it to be done. This appearing, his liability to pay his share of the cost is established, and he cannot excuse himself by showing that other work called for by the declaration of intention was not done or was not included in the contract under which the work for which he is called upon to pay was done. All that he can demand is, that it shall appear that the work for which he pays has been specified in the resolution and order. Whether they specify more or.other work is a matter of no consequence, for they are none the less a notice and order as to him for the work which has been done. The question is not what work is included and what has been done under the notice. On the contrary, the question is, does the notice include this particular work which has been done and for which the defendant is called upon to pay.

If so, the law has been satisfied, and the defendant is charged so far as the question under consideration is concerned.

We are of the opinion that the work in question is specified and described in the resolution and order of the Board within the strict meaning of the statute, and that the contract follows and carries out their true intent and meaning, and that all the steps have been taken which are necessary under the law to charge the defendant.

Judgment affirmed.

Mr. Justice RHODES expressed no opinion.