## TAYLOR *v.* PALMER.

[NOTE.—The case of *Taylor* v. *Palmer, ante,* 240, had been printed before this opinion was filed. The opinion should regularly have appeared at page 257 of this volume, as a substitute for the opinion of Mr. Justice SAWYER there printed.—REPORTER.]

SAWYER, J., dissenting :

When this case was decided I indicated a purpose, as soon as the other business of the Court would permit, to express my views more fully upon the question of the power of the Legislature, under the Constitution, to make an assessment for street improvements assessed upon the basis of benefits to the property affected, a personal charge upon the owner, and to authorize its collection by suit and personal judgment, as well as by sale of the land benefited. I then stated my conclusion, that there was no constitutional objection to the power, and that the personal remedy for collecting a tax, duly apportioned upon the basis of the property benefited, did not, in effect, make the assessment a tax upon the entire estate of the owner, instead of a tax upon the particular property benefited—did not convert a local assessment into general taxation.

Soon after the decision of this case was announced, the question was again in another form substantially presented, in the North Beach and Mission Railroad Company's appeal in the matter of widening Kearny street, just decided ; and, after a further, and reasonably thorough examination of the question, I am confirmed in the conclusion before attained, and shall now proceed to state the ground upon which it rests.

It has been repeatedly held, that the power of the Legislature does not depend upon a constitutional grant, but, on the contrary, exists independent of any authority expressly conferred by the Constitution ; that a State Legislature is endowed with all power appropriate to such bodies, except so far as it is limited by the express inhibitory provisions of the Constitution. In view of this principle, the Legislature of California, except so far as limited by express constitutional provision, is as amply endowed with all powers over the subject of taxa-

tion in whatever form, or for whatever purpose exercised, as the Parliament of Great Britain, or any other legislative body. In *Emery* v. *San Francisco Gas Company*, 28 Cal. 345, and several subsequent cases, we held the levy and collection of assessments of the kind in question in this·case to be an exercise of the sovereign power of taxation. We found a limitation upon the power of the Legislature over the subject of taxation in Article XI, section thirteen of the Constitution, in the following words: " Taxation shall be equal and uniform throughout the State. All property in this State shall be taxed in proportion to its value, to be ascertained as directed by law." We held that the words, " taxation," and " taxed," had acquired in the legal language of the country, when employed with reference to a particular subject matter in statutes, Constitutions and judicial proceedings, a restricted and technical sense; that they were used in this provision of our Constitution in such limited sense, and related only to such general taxes upon all property as are levied to defray the ordinary expenses of the State, county, town and municipal Governments, but did not include assessments of the kind now in question, levied to pay for improvements of streets upon the districts deemed specially benefited by the improvement; and that there is no limitation in the Constitution with reference to the latter class of special taxes as to the principle upon which they are to be apportioned. The only question in that case with reference to this subject was, are assessments of the kind in question levied under the taxing power? If so, in what sense were the words " taxation "·and " taxed " used in the clause cited? Did they include such assessments? And if not, is there any express restriction upon the power of the Legislature to determine the principle upon which the latter should be apportioned? The first question was determined in the affirmative, and the last two in the negative.

Both general taxation for the ordinary expenses of the Govment, State or municipal, upon a property basis, and assessments upon the basis of the property specially benefited, to pay the expenses of local improvements, are in all their essen-

tial qualities taxes, and levied and collected under the taxing power, and we so held in that case. They may, or may not, be apportioned upon a different principle; that is to say, the amount to be paid by each owner of property may be ascertained by a different rule, but, when ascertained, it is essentially a tax—a contribution of each man's share of a public charge levied and to be collected by virtue of the sovereign power of taxation—and a tax due from the owner of the property, not from the property as such. There can, in the nature of things, be no such thing as property in the sense of the exclusive right to enjoy a thing, and subject to taxation, without an owner. The terms owner and property are correlative. The existence of one necessarily implies the existence of the other. When the amount of a tax which ought to be paid in respect of any given piece of property is ascertained, it cannot be collected without taking from the owner a portion of his property equal in value to the amount of the tax, and whether the property which constitutes the basis of the tax is taken, or some other, the result to the owner is the same—that amount of property is taken from him in payment, and the tax falls on him. The thing taken is in no way affected—is neither better nor worse in consequence of the taking; but the owner is affected : he is so much poorer. The tax, no matter of what kind, when assessed, is the proper share of a public burden or charge of the party who owns the property, in respect of which the tax or assessment is levied. It is due from him to the public—and in that sense is a debt. This is conceded to be so in general taxation. Wherein does the difference between general and special taxation, in this particular, consist? In the case of general taxation, the owner is supposed to be benefited by the security and protection he receives from the Government to his person and property, by means of which the latter, at least, is enhanced in value, because his enjoyment of it is assured. In special local taxation, or assessments of the kind in question, the benefits also really accrue to the owner. As a matter of convenience, and in a general sense, we speak of the lands benefited. But, strictly speak-

ing, there is no such thing as benefiting the lands. Lands are not objects that can receive benefits. They are but insensate clods, to which it is not a matter of the slightest consequence whether they are what we call improved, or enhanced in value, or not. The owner may be benefited by rendering the lands more accessible or useful to him, more subservient to his enjoyment, and more valuable. The benefit accrues to the owner alone, and the public charge by means of which the special assessment accrues necessarily and properly falls upon him alone. The amount of the debt when ascertained is due from him, and so far as the duty to pay is concerned, the property through which the benefit accrues is only resorted to for the purpose of ascertaining each owner's proper share. When once ascertained there is no further necessary connection between the debt—the tax or assessment—and the specific piece of property in respect of which each item of the tax was imposed upon the owner. There can be no necessary difference in principle with respect to this point between general and special, or local taxation. So much for the apportionment, and the object on which the charge ultimately falls; the rest relates to the remedy—the means of enforcing payment. The law may provide for enforcing payment out of the specific property through which the benefit accrues, and limit the remedy to that property alone. In this sense it may be said to be a charge upon the property benefited, and not a personal charge against the owner. But even then, it ultimately falls upon the owner by taking his property in payment—a specific piece of property, to be sure, but none the less his.

Returning to the Constitution we find, as before stated, that the section cited only relates to general taxation, and that even as to this species of taxes, it only bears upon the apportionment. There is no limitation of the power of the Legislature over the remedy; and there is no express limitation at all upon the power of the Legislature over that species of taxation known as " assessments," unless it is found in some other provision of the Constitution. The only other provision appearing to have

any relation to the question in hand, is section thirty-seven of Article IV : " It shall be the duty of the Legislature to provide for the organization of cities and incorporated villages, and to restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent abuses in assessments, and in contracting debts by such municipal corporations.". This section does not purport, in terms, to limit the power of the Legislature over the subject at all, either over the principle of apportionment, or the means of enforcing payment. It simply makes it the duty of the Legislature to restrict the power of taxation, assessment, etc., of cities and villages, but leaves the measure of the restriction to the discretion of the Legislature. It even assumes that, but for such restriction, the powers of those subordinate divisions of the State would also be unlimited. *There is then no limitation whatever in the Constitution affecting the question, unless* the term *" assessments "* used in this section, and recognized as a legitimate mode of exercising power, *ex vi termini, necessarily imports, that, after having been properly apportioned, the payment of the amount assessed shall be enforced in a particular manner, and no other ; and that such mode, when the tax is not voluntarily paid, is by a lien upon, and sale of, the identical piece of property in respect of which the benefits accrued and the assessment was made.*

Does the term " assessments," *ex vi termini*, necessarily import anything of the kind ? The determination of this point solves the question, and to determine it, we need only look to the definition of the term as indicated by the practice disclosed in the statutes and judicial decisions of those States whence it was derived by us; for, when we adopted the word, we adopted the settled construction put upon it—the signification which it was understood to express. As we stated in *Emery* v. *San Francisco Gas Company*, the provisions of our Constitution upon the subject were taken from the Constitution of New York, and the term " assessments " had been in use in that and the older States from the time of their organization, and had a well understood practical signification. It must have

been adopted in full view of the practice under it, as well with respect to the form of assessment and the powers exercised in enforcing payment of this species of taxes, as to the principle of apportionment.   We have seen that there is nothing in our Constitution in express terms or in the nature of things, that limits the remedy to the specific property benefited.   Is there anything in legal adjudication, or the practice of the States, from which we derive the system to indicate such a limitation, or to indicate that the term assessment, as understood in those States whence it originated, *ex vi termini*, imports such limitation ?   If so, after a tolerably thorough search, I have been unable to find it.   *On the contrary, I find abundant evidence that from time immemorial the practice has been the other way.* Until recent modifications in some few instances, the statutes have required the assessments to be made as in our statute, relating to opening, extending and widening streets, (Laws 1863–4, p. 347,) under consideration in North Beach and Mission Railroad Company's appeal before referred to, upon the *owners of houses and lands benefited*.   In fact, these terms in said Act are copied from such statutes.   They, then, sometimes authorized and required the assessment to be collected by distress of *the goods and chattels of the owner*, under a warrant issued for the purpose, and if sufficient *goods and chattels could not be found*, then by sale of the premises—sometimes for a term of years, sometimes the fee.   Sometimes it was collected through *an action of debt or assumpsit, or action on the case, and execution issued thereon as in other personal actions*.   But generally—it may be said almost, if not quite, universally—the *land was not to be sold till the personal estate was exhausted*, and for the same reason, doubtless, that, generally, in all the States, executions on judgments are required to be satisfied out of the personalty, if sufficient can be found.   Sometimes a lien was given upon the land in respect of which the benefits were received, and the assessment levied.   Sometimes there was no lien at all upon the land.   *These were the usual modes of enforcing collection in those States from which we derived the term and the system*, as I shall now proceed to show by the authorities.

In New York City all of these modes have been in use at different times, or as cumulative remedies at the same time, and with reference to different improvements, since, at least, as early as 1787. There were various statutes upon the subject relating to that city, from 1787 to 1813, at which time they were all collated into one Act, entitled, "An Act to reduce the several laws relating particularly to the City of New York into one Act," and the principles of the former Acts re-enacted. From 1813 to the present time, as I understand it, that Act, as amended from time to time, and some special Acts containing the same principles and provisions with reference to the collection of assessments for street and other improvements, have been in force. These several laws and their history are fully stated in the several opinions in *Mayor of New York* v. *Colgate,* 12 N. Y., (2 Ker.) 141. An assessment had been levied to straighten and widen John street, a sale of the premises in respect to which the assessment was made had, which proved to be void in consequence of some defect in the proceedings. An action in the nature of an action to foreclose a mortgage was then brought, in pursuance of section two hundred twenty-three of said Act of 1813, which provides " that said sums so to be expended on behalf of the proprietor, and every sum which hath heretofore been *assessed among the owners or occupants* of any houses and lots in the said city, by virtue of the Act entitled 'An Act for regulating the buildings, streets, wharves and slips in the City of New York,' passed April 16th, 1787, or by virtue of an Act of the same title, passed the 3d day of April, 1801, and not repealed, or shall hereafter be assessed by virtue of this Act, shall be a lien or charge upon the houses and lots in respect to which such assessments have been made, and shall be entitled to a preference before all·other incumbrances upon·the same, and *may be sued for and recovered with costs, in like manner as if the said houses and lots were mortgaged to the Mayor, Aldermen and commonalty for the payment thereof.*" (Ib. 150–1.) Judgment was rendered for two hundred sixty-five dollars, with interest and costs. It was also adjudged that

the same was a lien upon the premises; that in default of payment they be sold and the proceeds applied in satisfaction, and " *that the plaintiffs have execution against the defendants for any deficiency which might exist.*" (Ib. 142.) This judgment was affirmed at general term of the Superior Court, and again by the Court of Appeals.

By the Acts of 1787, and 1801 also, street assessments " might be sued for and recovered in like manner as if the houses and lots assessed were mortgaged for the payment." (Ib. 143.) The remedies given by the Act of 1813 for the collection of the assessments for " paving and regulating and the opening of streets" by those sections found under those captions respectively are : " First—That the assessment is declared to be a lien upon the lots benefited. Second—It may be enforced *by distress and sale of the goods of the owners and occupants who are made liable for its payment;* and in case of opening streets, *an action of debt or assumpsit could be maintained for its recovery.* (Secs. 175, 186.)" (Ib. 143, 149, 152.) The assessments for paving streets under the Acts in force prior to 1813, " are to be made among the *owners or occupants* of all the houses and lots intended to be benefited thereby." (153.) The case of *Gilbert* v. *Havemeyer*, 2 Sand. 508, was an action to recover damages for seizing " merchandise of the plaintiffs " under a warrant authorizing the collection of an assessment for widening William street by distress and sale of the goods and chattels so assessed. The assessment for benefits under section one hundred seventy-eight of the Act was authorized to be made upon " the owner or owners, lessee or lessees, parties and persons respectively, who may be interested in or entitled unto the lands." (Ib. 509.) The Court say : " The assessment was, therefore, valid, and on being confirmed became a lien upon the lot assessed, and the owner and occupant, and each of them, by section one hundred eighty-six, *became liable to pay the same. If it were not paid on demand, the corporation could collect it by a warrant against the goods of the owner or*

*occupant.*"   (Ib. 510 ; see also *Wetmore* v. *Campbell*, Ib. 341, 344, 346, 354, for provisions of statute relating to New York City and practice under them.)   *Maurice* v. *Mayor of New York*, 8 N. Y. 120, was also an action against defendants for a levy upon goods of plaintiff to pay an assessment for improving streets and avenues in New York under the Act authorizing collection by distress.   (120, 124, 132.) It was held that the City of New York has power to regulate streets at its own expense, and when the work is completed cause the same to be estimated, assessed and collected of the persons benefited thereby.

In *People* v. *Nearing*, 27 N. Y. 308–9, it was held that it was perfectly competent for the Legislature to authorize the drainage of swamp lands and assess the expenses upon " the owners of the land benefited thereby."   Under the Act of 1827 incorporating the village of Williamsburg, the compensation for lands taken for a street were to be " assessed among the owners and occupants of the several houses and lots intended to be benefited," and the other expenses assessed " among the owners or occupants of all the houses and lots to be benefited thereby."   (*Sharp* v. *Johnson*, 4 Hill, 101.) " The Trustees are *not authorized to sell any land* until the Collector has made affidavit that the owner cannot be found, *or if found, that he has not sufficient personal estate in the village to pay the tax.*"   (Sec. 26, Ib. 103.)   Under the Act of 1824, incorporating the City of Brooklyn, the Trustees were authorized to improve streets and cause the expenses " to be assessed among the owners and occupants of the houses and lots intended to be benefited thereby, and the Trustees were authorized by warrant under their hands and seals to *levy the assessment by distress and sale of the goods and chattels of the owner or occupant* who should make default in payment." (Sec. 3.)   By the eighth section they were authorized to divide the village into well and pump districts, and provide wells and pumps, and assess and collect the expenses in the same manner as provided in section three for street assessments—that is, upon the owners of land according to the

benefits received. " Thus far," says Mr. Justice Bronson, " it is quite clear that there is *no power to sell lands* for making wells and pumps. The assessments *are to be collected by distress and sale of the goods and chattels of the persons assessed.*" (*Sharp* v. *Spier*, 4 Hill, 81, 82.) Again : " On looking at the eighth section, which authorizes an assessment for wells and pumps, in connection with the third section, to which the eighth refers, it will be seen that the assessment is not upon the lands but upon the ' owners or occupants of the houses and lots intended to be benefited thereby,' and the money is to be levied ' *by distress and sale of the goods and chattels of such owner or occupant.*' This language does not go beyond the creation of a debt or duty upon the owner in respect of the land, which he must satisfy at peril of losing his goods. It does not create a charge upon the land." (Ib., 84.) Thus he makes a clear distinction between assessments upon the owners of lands and assessments on the lands. The one, according to Mr. Justice Bronson, creates a personal charge— a debt or duty—resting against the owner only, and the other a charge upon the land. In the same case, an assessment of this kind is held not to be a tax within the meaning of the term as used in the statutes of New York, but an assessment like any other for improvements according to benefits received. So, also, under the subsequent charter of the City of Brooklyn, the expenses of street improvements are " to be assessed upon the owners and occupants of the lands and premises benefited thereby in proportion to the amount of such benefits." (*Cumming* v. *Mayor of Brooklyn*, 11 Paige, 600.) The Chancellor said : " The statute makes the assessment a *charge upon the personal estate of the owner* of the lands benefited ; and if the amount cannot be collected of him, the land itself is to be put up and sold." (Ib. 601.) In this case the lands were insufficiently described to make the assessment a lien upon them, but it seems to be taken for granted that the personal charge was valid notwithstanding the description was not sufficiently specific to charge the land. The provisions for assessing expenses of improvements in Brooklyn upon

owners, and collecting by distress of goods and chattels, were continued by Act of 1833 and 1834. (*McCulloch* v. *Mayor of Brooklyn*, 23 Wend. 459.) An assessment for widening William street was made upon the lessees and the owners of certain lots under the Act of 1813 relating to New York City. The lessees were bound to pay them by the terms of their lease, and the owners called upon the authorities to collect the assessment out of the personal property of the lessees. They declined and were proceeding to sell the lands, whereupon the owners applied for an injunction. The Chancellor held that complainant had an equitable claim to have the assessment collected out of the *personal property of the lessees*, and said: " It is a very general principle introduced into our laws that in cases of assessment and tax upon property, when there is a remedy given against both real and personal estate to collect the amount thereof, the remedy against the personalty shall be first exhausted, unless there is some specific and controlling equity to make it proper to proceed against the real estate in the first instance." (*Gouverneur* v. *Mayor of N. Y.*, 2 Paige, 437.) The preliminary injunction was retained on this point. In *Doughty* v. *Hope*, a sale of land on an assessment upon owners for setting curb and gutter stones on One Hundred and Twenty-fifth street, New York City, was in question. Mr. Justice Bronson said: " The sale of the land was not made under the warrant. That process issues for the purpose of collecting the assessment from goods and chattels, without · resorting to the land. (Sec. 175, and Statutes of 1816, p. 113, Secs. 1 and 2.) The assessment in this case was against the owner by name, and the warrant directed the officer *to collect the money from him. Thus far all was right*." (3 Den. 253.) · So, also, by the various Acts relating to the City of Buffalo, passed from 1843 to 1849, the expense of local improvements, including those for constructing a ship canal, are nominally " assessed upon the real estate in said city deemed benefited," etc., and made both a charge upon the land and a personal charge upon the owner. (*Bennett* v. *City of Buffalo*, 17 N. Y. 383 ; see opinion of Denio, J.,

388, for statement of statutory provisions.)    Says Mr. Justice Denio, in a dissenting opinion, but not on the point affecting the question now in hand : " It was conceded on the argument that an assessment, if properly made, would contain *a personal charge against the individual on the roll as owner of the land*, as well as a lien upon the land itself.    *This is undoubtedly so*, though it requires some care to find the authority to make the personal charge."    After citing various provisions of the statutes he says : " Again, by section six of title five of the Act of 1843, all taxes and assessments remaining unpaid for three months *may be recovered with interest against any person liable therefor.    This clearly contemplates a personal liability in addition to the lien upon the land. *   *   *  From these provisions I collect that, in making assessments for local improvements in Buffalo, as the law stood when this transaction took place, the roll should contain the name of the owner of the land assessed, *and that the tax is a personal demand against him, which may be enforced by a levy and sale of his personal property.*"    (Ib. 389.)    The Act approved in the great case of *People* v. *Mayor of Brooklyn*, 4 Com. 420, which has everywhere been regarded as settling all the questions determined in it, and has been repeatedly approved by this Court, required the assessment to be " upon the owners and occupants of the lands benefited by the improvement in proportion to the amount of such benefit;" and " the forty-second section authorizes the collection of the assessment or tax imposed for local or city purposes *out of the personal property of the owner of the land assessed,*" *and only permits the land to be sold for a term of years, " if sufficient personal property cannot be found,"* (p. 421.)    If this latter provision is unconstitutional for the reason that a personal liability is cast upon the owner, and the apportionment is void because the remedy provided for its enforcement is unconstitutional, then this case is wrongly decided, and it is singular that nobody discovered this point.    It is approved in *Brewster* v. *City of Syracuse*, 19 N. Y. 118 ; see also *Matter of improving Nassau*

*street,* 11 John. 79; *Laimbeer* v. *City of New York,* 4 Sandf. 110; *Bleecker* v. *Ballou,* 3 Wend. 264.

The case of *Litchfield* v. *McComber,* 42 Barb. 289, was an action brought by the Collector appointed for the purpose to collect an assessment to pay the expense of closing the tunnel, and extinguishing the right to use steam power in a certain district in Brooklyn of the Long Island Railroad Company, levied under the Acts of 1859 and 1860. The suit was brought under an Act passed in 1863, which added to the remedies then existing for the collection of the tax, by declaring that the sums which the several persons named in the assessment list are liable to pay, *may be sued for and recovered by the Collector of Assessments.* (Ib. 290.) The validity of this Act was attacked. The Supreme Court—Mr. Justice Brown delivering the opinion—well say : " Having ascertained that the assessment in question is a tax imposed for a local improvement, and the power exerted by the Legislature in the several Acts by which it was created and imposed was a *legitimate* exercise of the taxing power, it remains to consider whether the power of providing a remedy for its collection was restrained by any and by what limitations. The power of the Legislature to charge it on the lands is not disputed, nor do I understand the power to levy the tax by distress, or levy and sale of the goods and chattels of the owners assessed, is seriously put in controversy. *But the objection most urged is against the power to give a remedy by action against the owner of the property benefited. If the Legislature has the power to provide for the collection of this class of taxes by the levy and sale of the property of the owner not benefited by the improvement, to pay for which the tax is created—such as the goods and chattels of the owner, of which I think there cannot be any doubt—then it is difficult to say, upon any just reason, why it may not give a remedy by action against the owner of the property benefited.* This but enlarges the field of collection, extending over the State in place of limiting it to the county where the improvement is. The principle of the tax, the benefit and the burden

are the same. The remedy for its collection is enlarged, that is all. If the tax is just and legal in its inception, where is the limitation upon the legislative power to provide for its collection? There is no such limitation, I venture to think; and the implication is clear that the power is to be exercised at the legislative discretion. Without the power to enforce the collection the power would be an idle ceremony. *The personal liability of the owner of the property upon which a tax is imposed, is not a novel doctrine, nor is it asserted in the Act of* 1863 *for the first time.* The case of *The Mayor* v. *Colgate*, 2 Ker. 140, was an action to recover an unpaid assessment for widening a street in the City of New York; and the plaintiff had judgment. Judge Denio, in his opinion, says that he feels no difficulty from the circumstance ‘ that other remedies for the collection of them are given by the Act of 1813, and by subsequent legislation. It was of great public importance that efficient means should be provided by which the public might realize the sums assessed. Thus the assessments had been made a lien upon the lots, and *the remedy by distress and sale, and by action of debt, had been provided by a prior section*, and subsequent provisions provided for a sale for a term of years. But a case might exist where none of these remedies would be exactly adapted to the case. Both the owner and occupant might be without personal property; and purchases under *ex parte* sales are proverbially unsafe.’ So, also, where a tax is assessed under the general law for personal property, and no goods and chattels can be found by the Collector, out of which to make the tax, the eleventh section provides a remedy by summary application to this Court, which in a proper case *may enforce the payment by fine and imprisonment of the delinquent taxpayer*. These laws proceed upon the principle that a tax assessed by authority of law for a general or local purpose, creates a duty and an obligation by the taxpayer to make payment. This obligation results from the nature of the Government and the Constitution. The obligations are mutual. The former owes security and protection, while the latter owes services and contributions of money, to

the extent of his ability. The duty to serve when service is needed, and to pay when payment is required, is an elementary principle, without which civil Governments would not be possible. A tax, therefore, such as we are considering has no sort of resemblance to a mortgage upon lands, when there is no existing debt and no covenant to pay, as was suggested at the special term. In the case of a mortgage there is a grant with a defeasance upon the performance of the conditions, and nothing from which an undertaking to pay may be implied; while in the case of a tax there is an obligation to pay of the highest sanction. Nor is the obligation removed or qualified because the tax is primarily imposed upon the lands within the prescribed district, thought to be benefited by the improvement. *It is not the land the Government needs; it is money. The tax is assessed in money, to be paid by the owner in money.* I do not understand that there is any such thing, under our system, as a tax upon lands irrespective of the owner, except in the single instance of the lands of non-resident owners. The tax is assessed upon the person in respect to the lands, as it certainly is assessed upon the person in respect to the personal property taxed; much of which is invisible and intangible. The tax is made a lien upon the land superior to all other liens, but the charge upon the person of the taxpayer, and his obligation to make payment, still remains in force. *The personal obligation of the owner to pay is to be inferred from the authority to levy the tax by distress and sale of his goods and chattels, which is found in nearly all the tax assessment laws.*" (Ib. 292–5.) * * * "Thinking, as I do, that the assessment of the tax imposed upon the owners of the property an obligation to make payment, *I conclude that it was quite competent for the Legislature to add to the remedies given by the original Act an action at law for the recovery of the sums assessed to the owners respectively.*" (Ib. 298.) In my judgment, the reasoning in this opinion is to the point and unanswerable. I have noticed the statutes and decisions of New York thus fully because we derived our constitutional provisions upon the subject from that State,

where this species of assessment and taxation has been in use as long, if not longer, than in the other States; and because they have been far more frequently and persistently contested and more thoroughly discussed, and the practice concerning them more fully developed in the decisions there than elsewhere.

I will now more briefly consider the practice in other States. The earliest case in Maryland which has fallen under my notice is *The Mayor of Baltimore* v. *Howard*, 6 H. & Johnson, 383. The action was assumpsit, brought in 1825, to recover a sum assessed for paving a street " on owners of the lots on each side of the street," under Acts passed in 1796 and 1797— long before any of us came into being. (Ib. 383, 393.) In this case the law gave no remedy for the collection. Yet the Court held that the action was properly brought; that where the law authorizes a tax, but gives no remedy, or even where it provides a remedy by distress or action of debt, assumpsit will lie, on the principle, that, where the law gives a claim to one against another, it raises an implied assumpsit on the legal obligation. The Court say: " The objection that the action was improperly conceived is founded on the eleventh section of the Act of 1796, the Act of incorporation which authorizes the collection of taxes imposed in virtue of that Act, by distress or action of debt on the supposed ground that they can be recovered in no other way. But the tax in this case was imposed under the supplementary Act of 1797 (Ch. 54), which authorizes the tax, but gives no remedy ; and when no remedy is given the action of assumpsit will lie on the principle that where the law gives a claim against another it raises an implied assumpsit on the legal obligation to pay. But, if the tax in question was in fact imposed in virtue of the original Act of incorporation, it would make no difference, for giving a remedy by distress or action of debt is cumulative only and does not take away the action arising by implication on the legal obligation to pay a claim created by law." (Ib. 394.) In this case there was no lien on the land,

86

and no remedy in any form against it except through an execution issued upon a personal judgment in an action of assumpsit. And under the original Act of incorporation the remedy was either by distress or action of debt or assumpsit. In *Eschbach* v. *Pitts*, 6 Md. 71, an assessment for paving a street in Baltimore was a lien upon certain lands, transferred by an insolvent to a trustee for the benefit of creditors; but it does not appear under what Act made. The Court say: "The tax is not imposed on the owner of the property, but on the property. It is true, a personal action against him may be maintained by the city, but this in no manner affects the specific liability of the property." (Ib. 75–6.) *The Mayor of Baltimore* v. *Proprietors of Green Mount Cemetery*, 7 Md. 517, was an action of assumpsit to recover a paving tax assessed on defendants as owners of property on the avenue improved. That the action would lie seems to have been regarded as settled, for the contest was as to the liability to the assessment. *Clemens* v. *Mayor of Baltimore*, 16 Md. 208, was an action of assumpsit containing an *insimul computassent* count to recover a sum assessed for paving Fulton street. The Court below refused the following instruction, asked by Clemens, defendant in the action: "If the jury find that the claim sought to be recovered is a claim for paving done for the City of Baltimore on Fulton street, then the plaintiff cannot recover under the pleadings in this case." Held properly refused, and action maintained.

So, also, the statutes of New Jersey authorize the expenses of improvements to be assessed "among the owners and occupants of houses and lots intended to be benefited thereby." (Elmer's Dig. 656, Sec. 33.) And authorizes the enforcement of payment "by warrant under the common seal to levy the same by distress and sale of goods and chattels of such owner or occupant refusing or neglecting to pay the same." (Ib.) Or, in case of the City of Newark, it may require the owners themselves to make certain kinds of street improvements and coerce them to do the work by penalties "to be sued for and recovered with costs of suit in an action of debt." (Ib. 654,

Sec. 25.)   Or it may make improvements, assess the amount
on owners of lots and sell the lots and pay out of the proceeds
(Ib. Sec. 26), or it may itself, in its discretion, instead of the
latter remedy, pay for the improvements " and sue for and
recover the amount so paid from the owner or owners of such
lot, or his or their legal representatives, with interest and
costs, in any Court in this State having cognizance thereof, in
an action on the case, for so much money by them paid, laid
out and expended to and for the use of such owner or owners,
or his or their legal representatives, and in every such action
the said estimate or assessment, with proof of the amount
paid shall be conclusive evidence for plaintiff." (Ib. 654, Sec.
27 ; see, also, Ib. 657, Secs. 35, 36.)   And in some cases any-
body else may pay for the same and " sue for and recover the
same with interest and costs   *   *   *   as so much money
paid for the use of the person."  (Ib. 656–7, Sec. 33.)   *City
of Patterson* v. *Society for Estab. Useful Manuf.*, 4 Zab. 386,
was an action of assumpsit to recover an assessment for side-
walks under similar provisions.   The validity of the law on
this point was not questioned, but the liability on the ground
of exemption was.   Action sustained.

*The Northern Liberties* v. *St. John's Church*, 13 Pa. St. R.
104, was an action against the owners of land to recover one
thousand eight hundred and fourteen dollars and twenty-eight
cents, assessed as their share of the expense for laying water
pipes in front of their property.   By statute, " the amount of
the assessment is declared to be a lien, and may be collected
by action of debt against the owner before any tribunal hav-
ing jurisdiction of the amount." (Ib. 105.)   The validity
and constitutionality of the tax, but not the remedy, was
questioned.

*Nichols* v. *Bridgeport*, 23 Conn. 190, shows that in Connec-
ticut, also, the statute authorizing the expense of improve-
ments to be assessed on the " person or persons owning or
interested in the lands, etc., specially benefited," and that
payment is enforced by " warrant of distress, authorizing him
[the Collector] to collect of such person or persons the sums

by them respectively ordered to be paid as aforesaid." (Ib. 195.) Mr. Justice Hinman says: " Provisions of a similar character to this are contained, we believe, in most if not all the city charters in the State, either in respect to the laying out or improvement of streets, or in respect to public parks, sidewalks and sewers, and probably many other city purposes ; and these provisions, to a greater or less extent, have been acted upon ever since the organization of cities in the State." (Ib. 203.)

Similar laws for making improvements at the expense of owners of property exist in Massachusetts, and actions to recover the amount of the owners are maintained. ( *City of Lowell* v. *French*, 6 Cush. 223.)

So, also, in Ohio. *Hill* v. *Higdon*, 5 O. St. 243, is a suit by the contractor with the city against the owner of a lot to recover the sum assessed against him upon the front foot principle, as his portion of the expense, similar to the suits authorized by the Act of this State relating to San Francisco. It was maintained, the principal question being upon the validity of the assessment under the Constitution, but not the remedy. *Ernst* v. *Kunkle* was a similar suit against the owner upon a contract with the City of Cincinnati to macadamise Harrison Road, in which the assignee of the contract recovered the amount assessed upon defendant. (5 O. St. R. 521.) The Town Council of Lebanon may make certain improvements at the expense of the owners of lots fronting thereon, " and may recover the costs and expenses thereof against the proprietor, if a resident by action of assumpsit, in any Court having jurisdiction thereof with costs of suit." (*Bonsall* v. *Town of Lebanon*, 19 O. 419 ; see, also, *Creighton* v. *Scott*, 14 O. St. 439 ; and *Reeves* v. *Treasurer of Wood County*, 8 O. St. 336.)

In Michigan such assessments are made " on the owner or occupants of the lots and premises." (*Lefevre* v. *Mayor of Detroit*, 2 Mich. 587.) Says Mr. Justice Green : " The owner or occupant must be named in the assessment roll, because the assessment is made on him ; and, if not paid, a warrant

may issue for the collection of the amount by distress and sale of his goods and chattels. The land must be described, because, if the amount cannot otherwise be collected, the lot may be leased or sold for a term of years, to pay the assessment." (Ib. 588 ; see, also, *Woodbridge* v. *City of Detroit*, 8 Mich. 276–9.)

So, under the statutes of Missouri, the Town of Palmyra has power " to have footways and sidewalks of the streets paved at the expense of the owners or occupiers of the adjacent lots," and " recover the full expense thereof from such owner or occupier before any Court of competent jurisdiction, by action of debt." And this law is constitutional. (*Inhabitants of Palmyra* v. *Morton*, 25 Mo. 594.) So suits are maintained under the Act of 1855 (Laws 1855, p. 74) to recover the assessments levied upon the property holders benefited to construct levees and canals for reclaiming lands in certain designated districts. (*Egyptian Levee Company* v. *Hardin*, 27 Mo. 495–6.) So, under the charter of St. Joseph, streets are macadamized, and the expense " shall be borne by the owners of the adjoining property, and shall be apportioned and charged on the adjoining lots in proportion to their front, * * * and the owners of lots charged therewith shall be bound to pay said costs charged, like liabilities contracted by themselves, and may be sued therefor accordingly, and the lots or lands charged shall also be held a lien," etc. (*City of St. Joseph* v. *Anthony*, 30 Mo. 538.)

These several Acts have all been contested, but as to the constitutionality and validity of the assessments only, and held constitutional. So, *City of St. Louis* v. *Coon*, 37 Mo. 45, was a suit to recover cost of macadamizing a street assessed on owners of adjacent lots, to be recovered by suit. Plaintiff recovered and the remedy was questioned. The Court say : " There can be no doubt of the power of the Legislature to provide a summary mode of levying and collecting such taxes, and that they may declare what evidence shall be sufficient to show a prima facie case for plaintiff." (Ib. 49.) And in *Fowler* v. *St. Joseph*, 37 Mo. 239, the only remedy was a per-

sonal liability.  The Court say :  " Again, when the contract
[to improve a street] was made and the works executed, the
law in force did not make the amount apportioned a special
lien upon the property, but only created a personal liability
to be enforced by an action at law."   (Ib. 239.)

So, in Minnesota, there are statutes authorizing contracts for
improvements, the expenses of which, " shall be assessed on
said lots or parcels of land respectively, and collected for the
use and benefit of the holder of said certificate [showing work
to have been done] as other taxes are collected, by virtue of
this Act, or by civil action at the suit of a bona fide holder of
said certificate, against the owner of said lots or lands," etc.
(*Lovell* v. *City of St. Paul*, 10 Minn. 293.)

Thus, without pretending to have exhausted the sources of
information, after tolerably extensive researches, I have not
been able to find anything in our sister States, in judicial
determinations, or even in dicta, or by way of suggestion in
judicial opinions, tending to show that the collection of an
assessment for improvements, when once properly apportioned,
out of other property than that benefited, would in effect
render the tax *general* instead of *special and local*, or that to
give a remedy to enforce a payment generally out of any prop-
erty of the owner within the jurisdiction of the local tribunals
authorized to administer it, changes the character of the bur-
den from assessments proper to taxes in the restricted sense
before referred to, or renders it obnoxious to the constitutional
provision requiring taxes to be apportioned according to value,
or any other express provision.   It may be said in reply, that
this may be admitted, but that the authorities cited are not in
point ; because this precise question was not raised by counsel
or decided by the Court.   There are two answers.   *We are
on a question of definition.*   We have imported from the laws
and Constitutions of other States the word, " assessments."
What does it mean ?   If it does not *ex vi termini* import the
limitations contended for, then they do not exist in the Con-
stitution, for they are not found elsewhere in that instrument.
This is conceded.   These limitations must be found in the

definition of the word " assessments," or not at all.    A defini-
tion in lexicography, says Webster, is " an explanation of the
signification of a word, *or of what a word is understood to
express.*"    Now, I have examined the statutes and decisions,
and the practical working under them—the practical exposi-
tion of the signification of the term—in those States where it
had its origin, and where it has been long and constantly used,
with a view of ascertaining what the word was, and still is,
there " understood to express," and I find in the statutes, in
judicial opinions, in universal practice and by common con-
sent, as the citations made show, for a hundred years or more,
it has been used to express a species of special local taxes
assessed to pay for various kinds of improvements upon the
owners and occupants of real property benefited by the
improvement, or on both owners and property, and appor-
tioned sometimes in terms in the ratio of benefits, at others
according to frontage, superficial contents, value, etc.; that
this amount is usually, but not always, from the time of the
apportionment made a specific lien upon the property bene-
fited ; *that it is enforced by distress and sale of the goods and
chattels of the owner, if sufficient can be found; and if not, by
sale of the land for a term of years or in fee; by personal action
of debt, or assumpsit, or action on the case, against the owner;
or by action to enforce the lien alone, or an action to foreclose
and sell, as if the charge were a mortgage executed by the owner,
with judgment and execution for balance in case of deficiency.
In many, probably all, of the States, these concurrent and cumu-
lative remedies exist, and may be pursued at the option of the
parties.    But generally, perhaps always, in the earlier periods
of their history, it was necessary to first exhaust the personalty
before resort could be had to the realty.    If this legislative, judi-
cial and popular use of the word for so long a period of time does
not give a practical exposition of the meaning it was understood
to express—establish its definition—I am at a loss to know where
to look for its signification; and if it does, then no such limita-
tions as are claimed for it are* ex vi termini, *imported by the
word, and the limitations are not to be found in the Constitution.*

Again, the fact that this precise point has never been determined by any judicial decision, or announced by any Judge in dicta, or by way of suggestion, or even till recently in this State raised by counsel, notwithstanding the constant practice for a century or more, and the multitude of cases in which, and the great variety of cases under which, this class of assessments has been contested, is the very strongest evidence that there can be nothing in it; and it is absolutely conclusive upon the point that the word assessment was never understood to import the limitations now claimed for it.

In *Nichols* v. *Bridgeport*, 23 Conn. 203, on the question as to whether assessments of this kind were a constitutional exercise of the taxing power, Mr. Justice Hinman said : "Provisions of a similar character to this are contained, we believe, in most, if not all, the city charters in the State, either in respect to laying out or improvement of roads, or in respect to public parks, sidewalks and sewers, and probably for many other city purposes, and these provisions, to a greater or less extent, have been acted upon ever since the organization of cities in the State, and although questions in respect to the exercise of the power, have frequently arisen in the Courts, yet the constitutionality of the power itself has not, so far as we are advised, been seriously questioned in our Courts ; certainly it has not been so questioned in our highest Courts. Surely the long acquiescence of the community in the exercise of this important power, and the repeated sanction of it by the Legislature in chartering our cities, ought to be some evidence of the legality of it. It is difficult to believe that a doubtful power of this sort would be long submitted to without question. But we agree that this is not conclusive upon it, however persuasive it might be.". Upon this point the Supreme Court of the United States, in the recent case of the *State of Mississippi* v. *Andrew Johnson*, as the opinion is published in the newspapers, well say : " It is admitted in argument that the application now made to us is without precedent, and this is of much weight against it. Had it been supposed at the bar that this Court would, in any case, interpose to arrest

the execution of an unconstitutional act of Congress, it can hardly be doubted that application with that object would have been heretofore addressed to it. Such occasions have been frequent. * * * *The fact that no such application was ever before made in any case, indicates the general judgment of the profession that no such application should be entertained.*" These remarks apply with far greater force to the objection on constitutional grounds to the personal judgment now under consideration. The long silence of bar and bench necessarily concedes the power, and under the circumstances, this ought to be conclusive. This class of assessments has been resisted and litigated in the several States from their organization, and in some of them for a century or more, in almost numberless cases, and every objection, constitutional and otherwise, which the ingenuity of man could suggest has been raised. As counsel and Judges, the most eminent jurists that ever adorned bar or bench have had to deal with them. It is inconceivable, under the circumstances, that any point affording a ray of hope should have escaped the anxious and painfully scrutinizing observation of the able counsel, who, from time to time, have resisted them. It seems impossible that the discovery of this objection, *if valid*, should have been reserved for the legal acumen of the bar and bench of one of the youngest born of the States. The age is, doubtless, progressive, but I am unable to perceive that this case presents anything to justify us in seeming wiser than our fathers in the law.

After as thorough an examination of the question as my time and patience will at present permit, I am unable to find anything in the word " assessments"—conceding it to embrace the remedy, as well as the thing—*ex vi termini*, or—in the language of Judge Ruggles in *The People* v. *Mayor of Brooklyn*—" in the Constitution; in legal adjudication; in the practice of the Governments [the various State Governments], or in the nature of things," which should either invalidate the assessment now in question, or even invalidate the remedy provided to enforce its payment through a personal judgment

87

out of property other than that in respect to which the benefits accrued, and the assessment was made. If I have overlooked anything in the legislation, decisions and practice of other States tending to a contrary conclusion, it devolves upon those who maintain the limitations on the legislative power claimed in this case, to produce it. In my judgment nothing of the kind has been produced, and I have found nothing. I cannot perceive that the view here taken in the slightest respect conflicts with our decision in *Emery* v. *The San Francisco Gas Company*, or the definition of terms there given. We simply held in, that case, so far as any conflict suggested is concerned, that the terms " taxation " and " taxed," found in a certain clause of the Constitution, was there used in a restricted sense, and did not include " assessments," as that term was used in another clause, and pointed out the well settled distinction between the two classes of burdens. And those distinctions consist in the objects for which the different species of taxes are levied ; the different modes of apportioning the burden—of ascertaining each man's share—and the different bases upon which they rest, but have no reference whatever to the remedies for enforcing payment after the amount due is ascertained. The amount once ascertained in either species of taxation becomes a debt or duty personal to the owner, and the remedies applied in the older States now appear by the unbroken chain of authorities cited to be substantially the same as to both. I think the statute authorizing a personal judgment within the constitutional power of the Legislature, and, therefore, valid ; and that the judgment in this case is in all respects correct and should be affirmed.