# PIPER'S APPEAL IN THE MATTER OF WIDENING KEARNY STREET.

NEW TRIAL IN CASE OF REPORT OF COMMISSIONERS.—The rule that a verdict
will not be set aside and a new trial granted, on the ground that it is contrary to
the evidence, where there is a substantial conflict in the same applies to the
report of the Commissioners appointed to assess the damages and estimate the
benefits resulting from the widening of a street, and to the judgment of a Court
affirming the report, where the Commissioners make a personal inspection of the
premises, with even greater force than to verdicts of juries, or findings of a Court
based on evidence alone.

ESTIMATE OF BENEFITS RESULTING FROM WIDENING STREET.—It is not erroneous
for Commissioners appointed to estimate the benefits that will result to property
holders by the widening of a street, to assess the same upon the hypothesis that
all lots on the street will be benefited in the ratio of their values, provided,
there is evidence warranting such a conclusion.

ASSESSMENTS ON LOT OWNERS FOR WIDENING STREET.—If Commissioners
appointed to assess damages and estimate benefits to lot owners for widening a
street apportion the amount of money to be raised into two or more parts, one
part on the property holders of the street to be widened, and another part on the
owners of property fronting on the cross streets determined to be benefited, and no
complaint is made as to the correctness of this apportionment, the owners of lots
on the street to be improved cannot complain of the manner in which the part
apportioned to the cross streets is afterward apportioned among the property
holders on those streets, and vice versa.

BENEFITS ACCRUE TO LAND.—The benefits resulting from the widening of a street
accrue to the owner through his estate in the land, whether the estate be a fee or
a leasehold, and not through the buildings thereon. The enhancement in value
accrues to the land, not to the buildings.

ASSESSMENTS ON CROSS STREETS BENEFITED, CONSTITUTIONAL.—A statute author-
izing the assessment of a portion of the expenses for widening a street in a city
upon lots benefited, situate on cross streets adjacent to the street to be widened,
is constitutional.

IDEM.—A statute authorizing the Board of Supervisors of the City and County
of San Francisco to determine what part of the city will be benefited by the
widening of a street, and to assess the expense of the improvement upon the
specific portion of the city thus determined to be peculiarly benefited, is constitu-
tional.

APPEAL from the County Court, City and County of San Francisco.

The Legislature passed an Act (See Laws 1864, p. 347,) giving power to the Board of Supervisors of San Francisco to determine by order to lay out, open, extend, widen, or straighten any street in said city, and that it will be necessary to take private lands for that purpose. Acting under the pro-

visions of said law, the Board on the 19th of September, 1864, by order, determined to widen Kearny street to the width of seventy-five feet, instead of its then width of forty-five feet five inches. Such proceedings were thereafter taken by said Board that the County Court acquired jurisdiction and appointed three freeholders Commissioners of appraisal and assessment. The Commissioners proceeded to view the premises, and examined witnesses, and made a report of their appraisal and assessment to the County Court. By this report several lots belonging to Piper, the appellant, were assessed for benefits received by widening the street. None of appellant's property was taken, as his lots were on the side of Kearny street not disturbed, or on cross streets. The County Court assigned the 12th day of June, 1866, for hearing objections to the confirmation of the report, and on said day said Piper filed his objections, which were as follows:

"William A. Piper, by his attorney, comes and objects to the confirmation of the report of the Commissioners appointed to assess the damages for the widening of Kearny street, and avers that he is the owner of the following lots, to wit:

"A lot on the southeast corner of Kearny and Merchant streets, fronting thirty-nine and one half feet on Kearny street and sixty-eight and nine twelfths feet on Merchant street.

"A lot on the southeast corner of Third and Tehama streets, fronting thirty feet on Third street and eighty feet on Tehama street.

"A lot on the northeast corner of Third and Clementina streets; and for grounds of objection to said report he alleges and sets forth the following, to wit:

"1. That the assessment of damages and benefits to result from said improvement, as made by said Commissioners, is unjust, unequal, and not in any degree uniform.

"2. That in assessing the benefits the said Commissioners have assessed some lots, and particularly those of this objector, far beyond the benefits which said lots will receive from said

improvements, and have assessed other lots much below the
proper sums.

"3. That in assessing the benefits, there is included in said
assessments a large amount of property not situate upon, or
contiguous to, Kearny street, and which will not be directly
benefited by said improvement, nor otherwise benefited, than
as the whole mass of property in the vicinity of Kearny street
is benefited.

"4. That under the statute, in that behalf provided, no
property can be lawfully assessed for benefits to be received
from said improvement, except that fronting on Kearny street;
whereas it appears from said report that a large amount of
property situate on Third street, Bush, Sutter, and other cross
streets, has been assessed."

Under these general objections he then specified the particu-
lars wherein he claimed the assessment was unequal, etc.

The attorney for the city and county filed a replication to
the objections, and thereafter the County Court proceeded to
hear the objections of the contestant, and testimony was intro-
duced by both parties.     The County Court overruled the
objection of the contestant and confirmed the report of the
Commissioners.

The property taken was twenty-nine and seven twelfths
feet on the west side of Kearny, from Broadway to Market,
and a corner off Third and Market.     The assessment was
made on all property from Broadway to Market, and on the
streets crossing Kearny to a depth of two hundred and sev-
enty-five feet from the old lines of Kearny street, and on the
lots fronting on Third street, and on those fronting on Market
street, for two hundred and seventy-five feet on each side of
Third.     On the cross streets, the rate of assessment diminished
foot by foot as the distance from Kearny increased.     On some
of the principal cross streets this rate or scale, commenced at
eleven dollars per front foot; on others, when the grade was
steep or the street narrow, and consequently the benefit less,

this scale of eleven dollars was diminished in proportion, in some cases one third, in others one half, etc.

The contestant appealed from the judgment of the County Court.

A more general statement of the facts connected with the widening of Kearny street will be found in the case of the *Appeal of the North Beach and Mission Railroad Company*, *ante*, 499.

The other facts are stated in the opinion of the Court.

*J. B. Crockett*, and *Edward J. Pringle*, for Appellant.

The proof establishes beyond question that appellant's lot on Kearny street was assessed for benefits far beyond any which are likely to accrue. The whole basis of the assessment is erroneous, inasmuch as it assumes that all the lots on the street are to be benefited in an equal ratio. The report is erroneous in not having included the buildings in the assessment for benefits. The Board of Supervisors had no authority to include property on Third and Market streets, in the assessment for benefits, nor any property not fronting on Kearny street. It was beyond the constitutional power of the Legislature to confer such authority on the Board of Supervisors. The expense of widening the street should have been borne by the whole city.

A uniform percentage upon the market value of the lots could not possibly represent the respective benefits derived from the widening. Whatever other system should be adopted as the true one, this uniform percentage on the market values must be a false one. Because it is clear that elements of shape, exposure to light and air, and travel, must enter differently into the question of market value, and into the question of benefit by widening. All that can be said with any reason in favor of a uniform percentage, is that the benefit by the widening might be proportionate to the market value on lots of the same size and shape. Beyond that the proportion cannot go. A lot which presents a small frontage to the street, with a great depth, may have an equal market value with an

adjoining lot of great frontage and small depth. But the lot of great frontage must be more benefited by the light and air and travel which result from the widening than the lot which presents its narrower front to the thoroughfare. And so, where at one point of the street one foot of frontage equals in value four feet situated at another point, the one foot must be, relatively to market value, less affected by these results of the widening than the four feet. The latter presents four times the surface to be affected by all the widening influences. Again : the population of the town being greater near one end of the town than the other, greatly in excess at the south end over that at the north, the benefit of the widening must be greater where the necessity is greater for room to accommodate the crowd. In general the market value would represent this distribution of population.

The above are but illustrations of many points which will suggest themselves, in which the elements of market value differ from the elements of benefit by widening. If we can establish only one such point of difference, it is enough to convict this uniform percentage system of error. Its great vice is its uniformity. The lot holders were entitled to the judgment of the Commissioners upon each undivided lot. A tax per front foot, varying where the elements of benefit vary, would have been much more in accordance with the injunction of the statute which requires them to assess " as near as may be in proportion to the benefit which each shall be deemed to acquire," etc.

The Commissioners also erred in refusing to assess for benefits the owners of any of the houses within the territory deemed by the Board of Supervisors to be benefited by the widening. The statute is explicit, requiring the assessment to be made " upon all the owners and occupants of lands and houses within the territory," etc. In the exercise of a vague judgment the Commissioners have ignored this requirement in the case of the buildings. They have assumed to say that the buildings derive no benefit from the widening and should not be assessed. This is a fatal departure from the injunction of

the statute.   Where the statute has prescribed the Commissioners have no discretion.   That, in the judgment of the Commissioners, there is no assessable benefit to houses, is no excuse to them.   The Commissioners claim that the true ratio of assessment is obtained by taxing the lots irrespective of buildings, because each lot will bear its building sooner or later.   But the time at which the assessment is made is the time when the values are to be ascertained.   Whatever is then subject to be increased in value by the widening is the true mark for the assessment.

*A. Campbell*, for Respondent.

Should this Court examine into questions of fact, we urge, in all the cases, that the evidence is so conflicting that this Court will not disturb the assessment of the Commissioners, confirmed by the County Court, on full hearing of the whole testimony.   The witnesses are speaking generally in these cases to matters of opinion.   Taxation is not an exact science; if a reasonable approximation can be arrived at it is all that can be required.   (*Doe* v. *Vallejo*, 29 Cal. 386.)   In ascertaining the market value of lots, the elements of shape, light, air and travel must necessarily be considered; and in addition to and above all these, location, unless that is included in " travel." A lot with a very narrow front and great depth, on a good street, cannot be considered so valuable as one with a wide front and less, but sufficient depth for business purposes.   A small lot on that portion of the street most valuable from general causes—such as the concentration of population and business around it—will be benefited by the widening, by having the travel in its front increased on the great thoroughfare.   A large lot in a less valuable part will be in like manner benefited by having its travel increased; but the *relative* values of these two lots arising from their several locations and surroundings will not be changed.   Each will retain the respective advantages it had before.   Each will participate in the benefit from the increased travel precisely in proportion

to the advantage derived from its location. In a populous and valuable neighborhood the travel on the widened street will be greater than in a sparsely populated or non-business location. But the respective values of the several lots are determined by these same advantages of location, business and population; and when the Commissioners value the lots for assessment at their respective market rates, and put the higher amount on the lots south according to their location, and the rise which has there taken place, and a lower amount on the lots north because they have not partaken of the general rise, and assess a uniform percentage, it appears incontestable that the assessment is in exact proportion to the benefit. To the point—that appellant's lot will not be benefited at all—we contend that this question cannot be inquired into, either by the Commissioners, the Court below, or this Court; it belongs exclusively to the Legislature and their agents—in this behalf the Board of Supervisors. Appellant has had his day in Court (in Sec. 1, of the Act of 1863–4, referred to); he had there an opportunity to contend that he was not benefited, and could have been heard. (Sedgwick on Con. Law, 533; *Emery* v. *San Francisco Gas Company*, 28 Cal. 345, and cases there cited; 4 Comstock, 419, overruling 6 Barb. 209.) Power to apportion has no limit. The remedy is with the Legislature. (8 Wend. 102; 14 Ohio, 173; Acts 1863–4, p. 347, Secs. 1–8.)

By the Court, SAWYER, J.:

This is an appeal from the order of the County Court of the City and County of San Francisco, confirming the report of the Commissioners appointed by said Court to appraise the damages sustained by the respective parties, portions of whose lots were taken for the purpose of widening Kearny street, and to assess the benefits and apportion the expenses of the work upon the property benefited. For the purpose of the several appeals, we shall, without deciding the point, consider the questions raised as properly arising on the record. The

first two points presented are, that the appellant's lot is shown by the proofs taken before the County Court to have been assessed for benefits far beyond what are likely to accrue; but if mistaken in this, that it is assessed too high, as compared with the assessments for benefit to other lots; and we are asked to set aside the report as being against the weight of evidence on these points. This Court exercises appellate jurisdiction only, and reviews the action of two other bodies, which have passed upon the same questions of fact.

When the verdict of a jury, or finding of the Court, is based upon evidence in which there is a substantial conflict, this Court will not set it aside on the ground that it is contrary to the evidence. (*Lyle* v. *Rollins*, 25 Cal. 440; *Ellis* v. *Jeans*, 26 Cal, 273; *Doe* v. *Vallejo*, 29 Cal, 390; *Rice* v. *Cunningham*, Ib. 495.) The rule is not peculiar to this Court; it is an established principle in the practice of all appellate Courts. The reasons upon which this rule of appellate Courts is founded apply with even greater force, to proceedings of the kind now in question, than to verdicts. The law, in the first place, requires three Commissioners to be appointed, to make the appraisement and assessment. They are not, like jurors, selected by lot out of all citizens possessing the statutory qualifications—good, bad, and indifferent, and of every grade of capacity and intelligence—but are selected, after the parties interested are heard upon the question, with special reference to their fitness to discharge the particular duties devolved upon them by law, in the given case. After having been sworn to faithfully discharge their duties " without favor or partiality," they are required to " proceed to view the lands and tenements mentioned and described in the notice, ordinances, resolutions and maps aforesaid [of the designated district], and may examine witnesses on oath," etc. In case of " doubt respecting any legal principle involved in these proceedings," they are authorized, and required " to apply to the said County Court for instructions." It is their duty to inves-

tigate the subject thoroughly; examine witnesses if deemed important; obtain all the information within their power; reflect upon the subject, and finally embody the result of their investigation and reflection in their report. Their own observation, their own knowledge, their own reflections and judgment, as well as the testimony of witnesses, constitute important elements in the conclusions attained. The result of their investigations and deliberations having been embodied in a report and filed, a day is appointed by the Court to hear objections against its confirmation, and all parties interested are entitled to be heard, and to "take proof in relation thereto." Upon the facts reported, the report itself would make something more than a mere *prima facie* case, and it would devolve upon the attacking party to overthrow it by proofs, and the proofs should be clear beyond all reasonable doubt or controversy. The report is something more than the testimony of three intelligent and respectable witnesses. It is the judgment of three men selected under the law, in view of their peculiar fitness, after a thorough investigation of the matter committed to them, and embodies the result of their own experience, observation and reflection, as well as the information received from others. But this question has been fully discussed by eminent jurists, and we shall adopt what they have so well said, rather than attempt to discuss the subject anew.

*In the Matter of Pearl Street,* 19 Wend. 652, Mr. Justice Cowen said: "I do not deny that cases may arise in which a reconsideration of the report should be awarded, upon the mere weight of evidence; but to induce to such a course, the facts should be of a very decisive character, and border strongly on the conclusive. I am not prepared to say that, in reviewing the decision of these Commissioners, even a *prima facie* case against their award, derived from proofs independent of their opinion, should be listened to as a valid objection. It must, in general, be enough to sustain their estimates and assessments, that no positive rule of law has been violated. If we do not find that the legal interest of the tenant, owner,

etc., has been misapprehended, their decision then stands as a matter of opinion on the value of an article in the market. So many considerations of time, locality and other circumstances enter into the estimate, that the only means of finally settling the question is an appraisal. That is committed by the statute to Commissioners appointed by this Court and carefully selected. (2 R. L. of 1813, p. 409, Sec. 178.) They have power and it is made their duty to view the premises, if necessary, examine experts, to whom they may administer an oath, and explore all the best sources of information. (Ib. 410; Statutes Sess. of 1818, p. 196, Sec. 2.) With these means they generally combine a considerable degree of previous local knowledge. Great differences of opinion may and frequently do exist among witnesses. It is hardly ever safe to disturb the decision of such a question, or any other question of fact made by the tribunal to whom it is primarily committed. Whether it come from a jury, a master, referees or Commissioners, we must be governed by the same principle. The very circumstance that it is open to difference of opinion should lead us to conclude that the first decision can rarely be bettered by a reversal founded on the partial and refracted light of an appellate tribunal." Much more is very forcibly said upon the subject in the same case. After much doubt and great hesitation, on what appeared to be a perfectly clear case, Mr. Justice Cowen recommitted the matter to the same Commissioners, but he was afterwards, evidently, dissatisfied with this determination. (19 Wend, 671.)

Again. *In the Matter of John and Cherry Streets*, 19 Wend. 669, the same distinguished jurist says: "Admitting the Commissioners to have acted on correct principles, and that they proceeded regularly (which is denied in respect to the receiving of an unsworn appraisal, made under their direction, a very material paper which I shall hereafter notice more particularly,) I am not satisfied that I ought to remit this report for reconsideration upon any of the objections founded on value. All the proofs mentioned having been regularly before the Commissioners, I would presume that

they received due consideration ; and so far as they tended to increase the demands of the claimants beyond what was allowed, were not met with proper grounds of qualification. With the opportunity of viewing the premises, a local knowledge of the business and character of the street, of the market value of lots and buildings, and, indeed, all the elements which go to make up an opinion ; or, at least, the most advantageous means of acquiring the requisite knowledge in all particulars from the best sources ; and then the full means of applying their knowledge on consultation, the Commissioners have come to conclusions differing from those of the deponents whose affidavits were before them, and are now before me. The Commissioners, too, were sworn and had power to examine experts on oath—merchants, surveyors, mechanics, etc., adepts in commerce, values, mensuration, removing, building, repairing, etc., and I must intend that, whenever such examination was necessary to solve doubts it was had. *Men of ordinary capacity can hardly go through with such a laborious estimate and assessment and re-estimate and re-assessment as the one before me without becoming themselves expert in all the departments of knowledge necessary to the business they are about.* In regard to a few of the obligations, I admit that the affidavits go into particulars derived from skilful men and other satisfactory sources, which, under my limited means of judgment, lead me somewhat to doubt the accuracy of the Commissioners in the values which they arrived at, but I want more to enable me to disturb their report. I repeat, that the estimate and assessment of values belong peculiarly to them and I cannot set aside their report on the ground of error in this respect without a case is made against them clear, strong and indubitable. I admit that it is very difficult to make out such a case upon *ex parte* affidavits, which are the sort of proof usually before us in street causes, and I believe it has seldom been done. The proof is, in its own nature, open to much observation, and in common experience calls for great reduction, especially when it comes in the form of mere opinion as to price or benefit or damage in .

respect to a projected improvement. The most candid and skilful entertain opinions on these subjects widely different, and I cannot in this case place the results thus stated by witnesses, or such as I might myself draw from particulars thus stated, in successful opposition to what I must think the more enlightened views of the Commissioners. Mr. Justice Bronson remarked, *In the Matter of Furman Street*, 17 Wendell, 663, ' that the reviews on appeal can, for the most part, extend to error in principle only. When a right rule for making the estimate has been settled, it must very often be impracticable for this Court to ascertain whether too much or too little has been awarded to any individual for damages. In the case under consideration, many of the witnesses differ one half in relation to the true value of the land which has been taken for the street, and the Court has no adequate means of arriving at a true estimate. We can only interfere with the report where, upon the proof as it appears by the affidavits, there is a plain and decided preponderance of evidence against the judgment of the Commissioners.' What Judge, Commissioner or juror ever sat, what lawyer ever practiced in a Court of original jurisdiction where these questions of damage and benefit are daily heard, without witnessing the same conflict and arriving at the same conclusion ? The right rule is seldom mistaken. It is the present and future value in cash, of lands, rents, materials and labor. But the premises from which that value is to be drawn are often so complicated, and above all, the views of witnesses so imperfect, their language so obscure and the subject itself lying so much in the region of conjecture, that an oral examination and cross examination and all other, the best means of judgment are necessary. (*Vide*, *Commonwealth* v. *The Justices, etc., of Norfolk*, 5 Mass. 435, 437; *Commonwealth* v. *The Justices, etc., of Middlesex*, 9 Id. 388; *Commonwealth* v. *Coombs*, 2 Id. 489, 492; *Callender* v. *Marsh*, 1 Pick. 418, 432, 433.) * * * These reports of Commissioners, in respect to values, are in the nature of a verdict of a jury upon a question of fact, which is never set aside as against evidence unless it appear affirmatively and

clearly to have been unwarranted by the proofs. There is more difficulty in showing this against the Commissioners' report, because from the nature of the proceeding they must make a more free use of their private knowledge than juries are warranted in doing. The lattter are confined to action upon their general knowledge, and cannot go on their knowledge of particular facts without being sworn and communicating them as witnesses. (*Rex* v. *Rosser*, 7 Carr. & Payne, 648.) Admitting everything, therefore, to have been regular, I should hardly deem the report impeached upon its merits in any matter of valuation." (671.)

And *In the Matter of William and Anthony Streets*, 19 Wend. 694, Mr. Justice Bronson said: " Courts seldom set aside the verdict of a jury on the sole ground that they may think it against the weight of evidence. And yet there is much less difficulty in such a review than there is in the case under consideration. Jurors do not act upon particular facts within their own knowledge, but upon written documents and the testimony of witnesses submitted to their consideration. The evidence upon which they form conclusions may be put upon paper and submitted to the Court for consideration. But it is not so, or at most only to a very limited extent, in relation to the proceedings of these Commissioners. They are selected not only with reference to their integrity and general capacity for business, but on account of the knowledge which they are supposed to possess concerning the particular duty which they are appointed to discharge. Such information as they have in relation to the value of the property taken, and the probable effect of the improvement upon other property in the same neighborhood—in whatever way the information may have been obtained—they are at liberty to use. The very first thing which is required of them by law, after taking the oath of office, is to view the premises affected by the improvement. (Sec. 178.) They are thus to acquire information, and that, too, of the most important character, which there are no means of bringing before this Court. And beyond this, I entertain no doubt that the Commissioners may take the

opinion of others, in whose integrity and judgment they have
confidence, without swearing them as witnesses.   They may
converse with all classes of men concerning the business in
hand, and collect information in all the ways which a prudent
man usually takes to satisfy his own mind concerning matters
of the like kind, where his own interests are involved in the
inquiry.   The Commissioners must exercise their own · judg-
ment at the last, but they may first seek light from other
minds, the better to enable themselves to arrive at just con-
clusions.   When the original jurisdiction is exercised in this
manner, it is impossible that there should be anything like a
regular judicial review.

   " We cannot regard the Commissioners as witnesses merely,
and then suffer their judgment to be balanced by the opinions
expressed in three opposing affidavits, and to be outweighed
when a fourth is added.   For aught that we can know, the
judgment expressed by the Commissioners upon questions of
value, may combine the opinions of a hundred men who are
in all respects as well qualified to form just conclusions as
those who make opposing affidavits.   In settling questions of
value the Commissioners do not sit as a Court and jury and
decide upon the evidence of witnesses examined before them.
Nothing of this kind was contemplated by the Act of 1813,
nor can it be justly inferred from the Act of 1818, which
authorized them to administer oaths.   (Stat. of 1818, p. 196,
Sec. 2.)   Estimates from mechanics and builders may become
important in the discharge of the duties of the Commissioners,
and in these and other cases they may require the sanction of
an oath to the estimates which they receive.   If, in any case,
they make the opinions of others the basis of action without
exercising their own judgment, those opinions should be given
upon oath.   But when they only seek information for the pur-
pose of enlightening their own judgments, they may obtain it
in any of the ways in which men usually acquire knowledge.
They need not, and in point of practice they do not, sit as a
Court.   If in any case they take the testimony of witnesses
in relation to value, it is but an item in the account, which

may go to qualify, but cannot control their own opinions. How then is it possible that we can disturb the report, upon mere questions of value, on the single ground that five, ten or even twenty respectable men have sworn to opinions at variance with the judgment of the Commissioners?

"A review was given to this Court for the purpose of seeing that the Commissioners exercise their authority in the forms prescribed by law, and for the correction of any error in the principle upon which they have proceeded in making their awards. After what has been done in other cases, I will not say that we cannot go beyond this and examine questions of value. But there must be something more than the opinions of witnesses against the judgment of the Commissioners. We must have facts. There must be something like demonstration that the Commissioners have fallen into error." And in *Pryor's Appeal*, 5 Abb. 275, Mr. Justice Mitchell expresses similar views.

We have to start with, in this case, the report of the three Commissioners selected with reference to their peculiar qualifications for the important and delicate duties intrusted to them, and there is no objection raised as to their fitness. They spent some seven months in their investigations and deliberations, and enough of their doings is shown by the record to make it apparent that they carefully considered the subject, compared one lot with another, and thoroughly studied the various influences which have combined during the last few years to affect the value of the property in the district to be charged with the expense of the work. Upon the filing of the report, several parties out of the large number affected filed objections, and, so far as the records now before us show, they all selected the same two or three lots as standards of comparison, and relied mainly on the fifty vara lot of Main & Winchester, corner of Post and Kearny streets. If there is any inequality in the assessment, it may fairly be presumed, that it will be more apparent between that lot and those of the appellants than anywhere else. An investigation was had before the County Court upon these objections, and

the evidence was directed mainly to the lots selected by appellants for the comparison.    Evidence was introduced both against and in favor of the report, and the County Judge, after an elaborate review of the testimony, in an opinion evincing a critical and thorough consideration of the whole subject, sustained and confirmed the report of the Commissioners; and it is by no means clear to our minds that the reasoning of the County Judge, in his opinion in this case, is satisfactorily answered by the counsel of appellant.    However this may be, as a matter of reasoning, there is a manifest and substantial conflict in the evidence introduced upon the two points now under discussion, viz : as to whether the amount of the benefits assessed exceeds the benefits likely to accrue from the widening of the street; and as to whether the amount of benefits assessed is relatively too high.    On both points there is a wide difference in the opinions of appellant's own witnesses, as there necessarily must be in such matters.    Some of them evidently do not accurately distinguish between the enhanced value of the property on the south end of Kearny street, resulting from numerous other causes, and that which results alone from the widening of the street; while the latter, only, is to be regarded in assessing the amount of benefits. Some of the testimony is manifestly wild, but if we were to take the testimony of the appellant alone, and carefully scrutinize it, without reference to the report of the Commissioners, or the testimony on the part of the respondent, it would appear from it, upon the whole, that there is'a large enhancement of value in consequence of the widening of the street— as much at least as the benefits assessed; while the testimony of the witnesses on the part of the city shows a still greater enhancement of value, and strongly supports the report of the Commissioners, both as to the amount of the enhancement, and the equality of the assessment; and some of it is based upon an actual sale of the property of the appellant claimed to have been assessed too high.    It is plain, from all the testimony, that, at the south end of Kearny street, within the

69

last few years, there has been a very large enhancement in the value of property from other causes having no reference to the widening of the street—much more so than at the north end; and if we carefully analyze the appellant's testimony, it will be found, that the great discrepancy in the testimony lies almost purely in the domain of conjecture rather than in the domain of facts; that it relates to the cause of the enhancement of value, as whether due to the widening of the street, or other causes, rather than to the fact, or extent of the enhancement. Testimony as to value must necessarily consist very much of opinions and often be of a very unsatisfactory character, but this is true to a much greater extent with reference to the amount of the enhancement of values, which is due to each of several causes combining to produce a given result. Those witnesses of appellant who attempt to fix the value of the property at the date of their testifying do not vary so much; for some seven of them estimate the then value of Main & Winchester's lot, at from eight hundred dollars to one thousand one hundred dollars per front foot; or an average of about nine hundred eighty-five dollars; five of them putting it at one thousand dollars per foot, and six of them, the value of the appellant's lot, at from seven hundred to one thousand dollars per foot, or an average of nine hundred twenty-six dollars per foot. Tested by an actual sale at auction, the value of the latter seems to have been about nine hundred sixty dollars per foot. But when they come to estimate how much of this value is due to the contemplated widening of Kearny street, the testimony lies almost entirely in the field of conjecture; and as might be expected, there is a wide difference in the views of different parties. The Commissioners, in valuing the property for the purpose of obtaining a basis for estimating the benefits, fixed the then value of Main & Winchester's lot at about seven hundred seventy dollars, and appellant's lot at about seven hundred forty dollars per front foot—each being somewhat lower than appellant's witnesses placed the value at the time they testified, and relatively about the same. To this, as we understand it, the

benefits are added. Thus, it is seen, that the great discrepancy in the testimony of the appellant's witnesses, and between them and the witnesses of respondent, and the report of the Commissioners, relates, not to the value of the lands, but to the proportion which should be credited to the widening of the street, and that which is due to other causes, and the real contest arises upon testimony necessarily conjectural.

From considerations before stated, the peculiar qualifications sought in the appointment of the Commissioners, their long personal investigation of the subject, etc., the Commissioners, it would seem, must, in the nature of things, be better qualified to estimate these benefits than witnesses called to the stand for the occasion from among men engaged in active business requiring all their attention, to give, upon the spur of the moment, and upon less comprehensive views of the subject, their ideas, even though such witnesses may be dealers in real estate, and generally well informed as to its value. A careful examination of the testimony in the record cannot fail to show, that very much of that portion relating to the enhancement of value resulting from the widening of the street, as compared with that resulting from other causes, consists of crude and hastily formed opinions.

It is further insisted, that the assessment on Kearny street is erroneous for the reason that it is made upon the hypothesis, that all the lots on Kearny street will be benefited by the improvement in the ratio of their values, whereas the proof shows the fact to be otherwise. This point is really necessarily involved in the second, but it is discussed in the briefs as a separate point and requires more particular notice. We are not authorized, nor are we asked, to assume as a legal proposition that the benefits to the several lots fronting on the street will not be in the same ratio as that of their value. It is a question of fact, and must be determined as such on evidence. And so the appellant treats it. But it is, also, one of those facts which lie almost wholly in the field of conjecture. Neither the senses nor our intellectual faculties can fully appreciate it. It cannot be exactly seen, or felt, or weighed;

nor can its dimensions or boundaries be accurately measured and defined. It is a fact which the Commissioners were called upon to determine, and after a survey of the entire field, and giving the question the best consideration they could, they did determine that the benefits resulting to the owners of the property from the improvement would be in this case in the same ratio as that of the value of the property. On the hearing of objections, before the County Court, this was one of the grounds, and the main ground of objection to the report. Testimony was taken upon the precise point, and witnesses, so far as we can judge, equally reputable, and equally competent, differed in their opinion upon the question. Two of the Commissioners, Webb and Torrey, testified that in their opinion the benefits resulting to property along the whole line of Kearny street would be in the ratio of its value, and the testimony of Sherman and Burr is to the same effect. If these opinions are correct, as to the equality of ratios between the enhancement of value by improvement, and the value of the property before the widening of the street, the basis upon which the benefits are apportioned on that street is the proper one. It may be true that the repetition of their opinion by the Commissioners upon the stand as witnesses adds nothing to the force of the report. If this be conceded, it still detracts nothing from the weight of their opinions upon the point, whether regarded as their evidence, or their finding upon the question based upon inspection and information obtained, as well as their own judgment. It shows, at least, that they still adhered to the opinion, after it had been controverted and counter testimony taken, and the matter had been reconsidered in the light of such objections and testimony. By way of argument, it is said, that any one acquainted with the topography of the city, must see at a glance that the south end of the street must be benefited far more, in proportion to its value, than the north end, and such was our first impression, but, the more we reflect upon the matter, the more difficult we find it to establish the conclusion by any satisfactory course of reasoning.

The street is simply widened. Every foot of ground upon the entire street to be widened has already been occupied for years. It will open into the same street, after it is widened, that it did before. The same streets cross it—no more and no less—and at the same points as before. The hills at the north and west were there before. The improved portion of the street will occupy the same relative position to the rest of the city, and to the localities toward which the business and population are tending, that it did before. The testimony does not show that the tendency of the population and business spoken of toward the south, has heretofore been owing to the widening of this street. It has manifestly, to a great extent, at least, been owing to other causes   A better class of business, requiring better and finer buildings, and inducing greater travel, will undoubtedly seek the street when widened, and it is not easy to see why the better class of business should not seek the entire street. It is said that toward the northern end the main travel comes down Washington and Clay streets, crossing Kearny into Montgomery. This is at present, doubtless, equally true of the streets crossing south of Clay. But if the anticipations of the projectors of the widening of Kearny street are realized, Kearny street, opening into Third, will become the great thoroughfare through the very heart of the city, from north to south, on the line of greatest travel, and the business of the fashionable world, to a great extent, transferred, or extended from Montgomery to Kearny street, and the travel which now comes to Montgomery instead of crossing will pass into Kearny. This is the result, to some extent, anticipated by the Commissioners, as appears in the testimony of one of them. There is, it is true, as stated in the argument, a rise of ground from Pacific to Broadway, but it is not so great but that a street railroad passes over it, and when Broadway is reached Kearny street opens into the most spacious avenue in the northern part of the city, extending westward with a grade easier than any other, and far lighter than on Washington. Can it be for a moment doubted that when Kearny street is widened, broad sidewalks

constructed, and first class buildings erected, the favorite line of travel from the north and northwest part of the city will be down Broadway into and through Kearny street, or that the anticipations of the Commissioners as to this street becoming the leading thoroughfare of the city from north to south are within the bounds of reasonable probabilities? When Kearny street is widened into the most spacious street in the heart of the city running in that direction, and the present structures on it are replaced by first-class commercial buildings from Market to Broadway, can it be doubted that much of the travel now coming down Geary, Post, Sutter, Bush and Pine streets, crossing into Montgomery, will pass into Kearny and northward on that street toward, and eventually, to a considerable extent, to Broadway? Or that the building up and occupation for fashionable shops of the southern half of Kearny street thus widened will of itself create a demand for similar structures toward the north, and gradually, at least, force such improvements forward until they reach Broadway? One of the Commissioners testifies that, after obtaining all the information they could in respect to travel, " they found the amount of travel about equal at all the crossings from Market to Washington; that the conclusion was, that property opposite the Plaza would be as much benefited as any south of it." The property of the appellant is opposite the Plaza, within the district between Washington and Market, and somewhere in the neighborhood of midway between the two termini of the portion of Kearny street to be widened. Should the widening of Kearny street result as anticipated, in making it the leading thoroughfare of the city from north to south, taking much of the travel that now crosses to Montgomery, the appellant's lot must be greatly benefited, and it is not easy to satisfactorily show why it should not be relatively as much benefited by the improvement as any other. Much may be said on both sides of the question, but we do not propose to discuss it at greater length. While we are not entirely satisfied that the rule adopted works with perfect equality, it is not entirely clear from the testimony or argument that it does

not; and the question was one peculiarly in the province of the Commissioners to determine. It must, also, be admitted, we think, that they both had better opportunities of arriving at a correct conclusion, and that they were personally better qualified to determine the question than we. The matter was re-examined by the County Judge and further testimony taken —the witnesses appearing in person before him—and, after a laborious consideration of the case, the report of the Commissioners was confirmed. The testimony is so much in conflict, and consists so entirely of matter of opinion, that we should not be justified in holding that the Commissioners and County Court erred.

It is argued that if the apportionment on Kearny street is made upon a correct principle, then the apportionment on Third street, and the cross streets within the district determined to be benefited, which was made upon a different hypothesis, must necessarily be erroneous. But this conclusion does not necessarily follow. These streets occupy an entirely different relation to the improvement made. It is supposed that the widening of Kearny street will make it the great thoroughfare north and south through the heart of the city, as Montgomery street now is, and the benefit to the cross streets will result solely from the fact of their close proximity to this great thoroughfare. As the benefit to property on those streets results from its proximity to, and not from the fact of its bordering on, the improvement, the nearer a lot on the cross streets approximates this thoroughfare, the greater will necessarily be the benefit derived. It is upon that very theory that the Board of Supervisors fixed upon the limits of the district determined to be benefited by the improvement for the purpose of assessing the expenses to be incurred in making it. As the locality recedes from the great artery of travel and business on the cross and secondary streets, the population tributary to it, and the travel upon it, gradually diminish till it becomes very small, and the value of the property diminishes in about the same ratio till it becomes valuable only for the purposes of husbandry. On the cross streets this

gradual receding from the proximity of the improvement takes place; but it is not so on that portion of Kearny street widened. The diminishing scale of benefits as the property recedes from Market street along Kearny would not furnish the proper rule, for the very obvious reason that the improvement which it is supposed will work the great revolution in the line of travel and business is not at Market street, and there is no receding from it, as the advancement is made northward along Kearny street; but, on the contrary, the advancement is on the very line of the improvement, and the line of the increased travel and business, throughout the entire distance to Broadway. There is nothing in the testimony tending very strongly to show that the mode of apportionment adopted by the Commissioners for the cross streets and Third street does not operate equally. The Commissioners found upon examination four different classes of lots and property within the district, differently situated with reference to the contemplated improvement : Firstly—Kearny street, the street to be widened. Secondly—Third street, on the south side of Market, and virtually an extension of Kearny street southward from the point where the widened street terminates. Thirdly—The North Beach and Mission Railroad; and Fourthly—Streets crossing Kearny. The whole amount to be raised was first apportioned among these four classes—a certain amount to Kearny street, and a certain amount to each of the other classes. No complaint is made that the proper portions have not been assigned to each of these divisions or classes, if the property on Third and the cross streets is liable to be assessed at all. It being assumed that the proper amount has been assigned to Kearny street, the owner of property on Kearny street is thenceforth interested no further than to have the part assigned to Kearny street equally apportioned among the property holders on that street according to the benefits. He cannot claim that an error has been made in apportioning the amount assigned to cross streets among the property holders on those streets; or that the Commissioners adopted a different mode of arriving at the apportionment on those streets.

The statute prescribes only one rule of apportionment, and that is according to benefits. But, to ascertain the benefits, it may be necessary to apply different principles to property having a different relative situation to the improvement, and presenting different elements affecting the questions of value and benefits. The Commissioners, in this instance, found it necessary to consider different elements in making the apportionments according to the benefits, and it rests with the objectors to show conclusively that they erred in their estimate of the effect of these various elements.

It is next claimed that the Commissioners erred in not assessing the buildings on the lots, as well as the lots, and that the buildings were not considered in the assessment. The law does not say that the buildings, as such, shall be assessed separately from the lots. The assessment is to be in proportion to the benefit which the owners and occupants of lands and houses shall acquire, and is made a lien, upon and collected out of, the lands through which the benefit is derived. The property enhanced in value, and through which the benefit accrues is the thing in respect to which the assessment is made, and the basis on which it rests. Section seven says that the Commissioners " shall apportion and assess the whole amount    *    *    *    upon all the owners and occupants of lands and houses within the territory deemed    *    *    * benefited by such improvement, as near as may be in proportion to the benefits which each shall be deemed to acquire by the making thereof." And section sixteen provides : " The expense of any public improvement herein authorized shall be defrayed by assessment on the owners and occupants of houses and lands, corporations and companies, that may be benefited thereby." And by section eight the report must specify " the sums of money which each and every owner or occupant of houses and lands, corporation or company, deemed to be benefited by such improvement    *    *    *    should pay toward the expense of making the same, and the lands [not lands and houses] in respect to which he shall be deemed by

70

them to be benefited." Section fifteen requires the assessment roll to contain, in proper columns, " the names of all persons * * * assessed when known ; " " the description of the land [not lands and houses] in respect to which they are assessed ; " " the amount to which such person shall respectively be assessed," and the amounts are to be collected in the same manner as taxes are collected in said city and county, " and shall in like manner be a lien upon the respective tracts or parcels of land," etc. [not lands and houses]. Thus it appears that when reference is made to the property " in respect to which he shall be deemed by them benefited" as in the eighth section, or " in respect to which they are assessed," or upon which the amount assessed " shall in like manner be a lien " as in section fifteen, land only is mentioned. Nothing is said about houses. And houses are only mentioned in those sections by way of *descriptio personæ* in connection with lands to indicate the person who is to pay the assessment upon the lands through which the benefit is acquired. Lands include the houses erected on them. The owner and occupant is to pay an assessment in proportion to the benefits received—not upon the valuation of the entire property, including buildings. If he is assessed in proportion to the entire benefit received, it can make no possible difference whether a part of the benefit is credited to the land and a part to the house erected on it, or all credited to the land. It is all taken into consideration somewhere. Nor do the injunctions of the statute require in terms, or by necessary implication, that it should be so distributed.

The land, in the strictest sense of the term, is the only thing of a permanent character. It cannot be removed, enlarged, diminished or destroyed, and we do not see why the benefit should not all be regarded as accruing to the land alone. It is so regarded in theory by writers upon political economy. Adam Smith, in his great work on the Wealth of Nations, says: " The building rent is the interest or profit of the capital expended in building the house. In order to put the trade of a builder upon a level with other trades, it is

necessary that this rent should be sufficient first, to pay him the same interest which he would have got for his capital if he had lent it upon good security; and, secondly, to keep the house in constant repair, or, what comes to the same thing, to replace, within a certain number of years, the capital which had been employed in building it. The building rent, or the ordinary profit of building, is, therefore, everywhere regulated by the ordinary interest of money. * * * Whatever part of the whole rent of a house is over and above what is sufficient for affording this reasonable profit naturally goes to the ground rent; and when the owner of the ground and the owner of the building are two different persons, is, in most cases, completely paid to the former. The surplus rent is the price which the inhabitant of the house pays for some real or supposed advantage of the situation. In country houses, at a distance from any great town, where there is plenty of ground to choose upon, the ground rent is scarce anything, or no more than what the ground which the house stands upon would pay if employed in agriculture. In country villas in the neighborhood of some great town it is sometimes a good deal higher; and the peculiar conveniency or beauty of situation is frequently very well paid for. Ground rents are generally highest in the Capital, and in those particular parts of it where there happens to be the greatest demand for houses, whatever be the reason of that demand, whether for trade and business, for pleasure and society, or for mere vanity and fashion." (Vol. III, Lon. Ed., 1805, pp. 294–5.)

Thus, that profound thinker arrives at the same conclusion upon this subject, that the Commissioners in this case—three practical business men—attained, after investigating the subject in a practical way, and which, it seems to us, must be attained by every reflecting mind. It would seem that it must be so from the nature of things. How could it be possible that a building, wherever situate, should be worth any more than it would cost to put another there like it, and, say, the rent, or that portion of the net rent over wear and tear, during the period of time required to erect it, and put it in a condi-

tion for occupancy? If it were destroyed to-day, another could be erected at actual cost to-morrow, and the destruction and restoration might be repeated *ad infinitum.* If any value accrues in consequence of changes in the surrounding circumstances, it necessarily attaches to the land—to the location. Should the building be destroyed by fire the land would sell for as much without, as with it, less the cost of erecting another like it, and the net rents during the period required to put it in a condition to occupy—in practice probably for more. It would make no difference whether the land was in the hands of the owner in fee, or under lease; for, in the latter case, the enhanced value would, during the term, go to the leasehold estate in the land. The building would actually be worth no more annexed to a leasehold estate, than to the fee. It could be replaced for the same money in one case as in the other. In this case, the Commissioners did take into consideration the entire benefits to buildings, as well as lands. This presumption would arise on the report itself. But one of the Commissioners, Torrey, was called to testify upon the point, and said: " We took into consideration the benefits to buildings and lands. The usual way of assessing is on lands and improvements [probably referring to valuation for purposes of ordinary taxation]. This differs—it was the benefit to the property we were looking for." And that is precisely what the statute required them to look for. Upon the views before presented, the only enhancement of value to buildings in consequence of the improvement that could in any event take place, would be the increased rents during the time it would take to erect such a building, or put a building already there in a suitable condition. A party having a suitable building on his land would hold this advantage—no more. The Commissioners found, that on one side of the street throughout its entire length, it was necessary to cut away the buildings for a distance of over twenty-nine feet—the width added to the street—and that, as a mattter of absolute necessity, all the buildings on that side would have to be rebuilt, or greatly remodeled. On the other side they found a class of third and

fourth rate buildings, some of brick and some of wood, none of which, it is conceded on all hands, are suitable to the condition, or contemplated business of the widened street. All, therefore, would either have to be entirely remodeled or torn down and new ones erected in their place, or else the owners could not reap the full benefits which would otherwise accrue to their lands. Either the change must be made sooner or later, or the benefits resulting from the widening would not practically accrue. The Commissioners found that it would take about the same time to remodel, so as to adapt these buildings to the new condition of things, as to construct new buildings; and that the owners would therefore, sooner or later, all alike lose about the same amount of time in the interruption of the use of the buildings, and that the only element which could possibly give additional value to the building, as such, was therefore wanting. They determined that, under the circumstances of the case, the only benefit accruing to the owners and occupants of the houses and lands accrued in respect to the lands; and we see nothing in the testimony or arguments that would justify us in setting aside the report of the Commissioners, and the order of the County Court confirming it, on that point. There is much less plausibility in this objection than in the second and third.

The fifth point is, that the Board of Supervisors had no constitutional authority to include Third and Market streets, and portions of the several cross streets in the district supposed to be benefited, and, therefore, to be assessed for the payment of the expenses of the improvement. And the sixth point is, that the expense should have been borne by the whole city; and the Board of Supervisors had no constitutional power to impose the burden upon a specific portion of the city supposed to be peculiarly benefited. These points seem to be necessarily inconsistent with each other. But the question has been settled against the appellant in this State, and, by what may be regarded as a uniform line of decisions in the other States. (*Emery* v. *San Francisco Gas Company*, 28 Cal.

372; *People* v. *Mayor of Brooklyn*, 4 Comst. 430, and cases cited.)

If the facts are correctly ascertained by the Commissioners, no positive rule of law appears to have been violated, and upon the facts there is a manifest and substantial conflict in the evidence on the points in contest. We are of opinion that the order confirming the report of the Commissioners must be affirmed, and it is so ordered.

Neither Mr. Justice RHODES nor Mr. Justice SANDERSON expressed any opinion.